1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10
11

| | |
|---|---|
| ANTHONY LAWRENCE MARTINEZ, | ) Case No.: 1:10-cv-00490-JLT |
| Petitioner, | ) |
| | ) ORDER DENYING WITH PREJUDICE THE |
| | ) PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ) (Doc. 1) |
| | ) |
| M. D. McDONALD, | ) ORDER DIRECTING CLERK OF COURT TO |
| Respondent. | ) ENTER JUDGMENT AND CLOSE FILE |
| | ) |
| | ) ORDER DECLINING TO ISSUE CERTIFICATE |
| | ) OF APPEALABILITY |
| | ) |

18
19

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

20 pursuant to 28 U.S.C. § 2254.  On March 31, 2010, Petitioner filed his written consent to the

21 jurisdiction of the Magistrate Judge for all purposes.  (Doc. 7).  On July 1, 2010, Respondent filed his

22 written consent to the jurisdiction of the Magistrate Judge for all purposes.  (Doc. 13).

23

## PROCEDURAL HISTORY

24

Petitioner is in custody of the California Department of Corrections and Rehabilitation

25 ("CDCR") serving a determinate sentence "exceeding 100 years in length plus multiple consecutive

26 life terms" pursuant to a judgment of the Superior Court of California, County of Stanislaus (the

27 "Superior Court") on numerous counts related to a series of home invasion robberies conducted by

28

1

Petitioner and two co-defendants while armed with firearms.  (Lodged Document ("LD") 1, pp. 2-4).

Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which, on August 4, 2008, affirmed the judgment of conviction, struck one of Petitioner's enhancements, and stayed the sentence as to counts 14 and 35.  (LD 1, p. 161). Petitioner filed a petition for review in the California Supreme Court, which, on August 26, 2009, denied the petition.  (Id., pp. 5, 6).

Respondent concedes that the all grounds for relief in the petition have been fully exhausted. (Doc. 22, p. 6).

## **FACTUAL BACKGROUND**

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision:

### **Count 1-May 25, 2003**

Shortly after midnight on May 25, 2003, Keyes resident Jimmy Lasater awoke to discover two men standing inside his house, about four feet from him, with guns pointed at his head. One gun looked like a chrome or light-colored snub-nose .38 revolver. The men were wearing ski masks, dark jackets, and what appeared to be leather gloves. They threw Lasater's pajama bottoms at him and told him to put them over his face, then pushed him to the floor and tied his hands behind his back with a rope that had been in one of the bedrooms. The pair then took everything out of Lasater's pockets and began ransacking the house. While this was going on, Lasater could hear two male voices. There was also a third robber in his bedroom, but, because this person whispered, Lasater could not determine whether the individual was male or female.

The robbers asked Lasater where his guns were, and one wanted to know which key went to the safe in Lasater's bedroom. They took the cash from Lasater's wallet, $6,000 to $10,000 from the safe, all of Lasater's approximately 10 firearms, and various the person who asked about the key to the safe later asked about the keys to Lasater's Camaro, the vehicle was not taken. At some point, the robbers called Lasater by his first name, and said they were not going to bother his cars, because he was cooperating and they knew he was going to hand them on down to his grandchildren. [Footnote]

Lasater estimated the intruders were in his house about an hour and a half to two hours. He did not recognize them or anything about their voices, except that they sounded Hispanic to him. Authorities recovered one of his guns, a Browning nine-millimeter semiautomatic, following the arrests in this case.

### **Counts 2-4-June 26, 2003**

In June 2003, P.S. and his wife, Jane Doe One, owned two businesses in Turlock. At approximately 12:30 a.m. on June 26, the two were asleep in their Turlock residence when they were awakened by a loud noise and the sound of glass. Upon getting out of bed, Jane Doe One discovered that the living room door was broken in two, and there were footsteps and four or five flashlight beams coming toward her. She and P.S. tried to close and lock the bedroom door, but the intruders broke through. All were dressed in ski masks, dark clothing and gloves. One's gun was touching Jane Doe One's forehead. She believed there were four or five

intruders, all with guns and flashlights; P.S. believed there were two hands and two guns, one of which was silver-colored and did not have a cylinder.

Two people came into the bedroom. One briefly shined the flashlight in Jane Doe One's eyes, blinding her, and told her to look away. She complied, and was told to get down on the floor. When she did so, one of the intruders tied her hands with cords cut from electrical appliances in the bedroom, while another intruder tied her legs at the ankles. At one point, she was touched on her side with a sharp object. The first intruder took her diamond wedding ring from her finger.

P.S. was also told to get down on the ground, which he did. Electrical cords were used to tie his hands behind his back and bind his legs near the ankles. One of the intruders said, "'You know why we're here.'"  The voices were male, but P.S. could not see anyone because a blanket was thrown over his upper body. He could hear things being taken out of the dressers, as well as people going in and out of the room. Although he never actually saw anyone, he heard two male voices in the bedroom, as well as footsteps elsewhere in the house. He did not notice anything unusual about the voices, but Jane Doe One believed the intruders possibly were African-American. She based this on their accents and voices, as she saw no skin.

After perhaps 10 or 15 minutes, someone pressed down on P.S. with a knee and showed him a bank deposit bag for one of the businesses, wanting to know what it was. Shortly after, something was pushed down against P.S.'s cheek, causing him to scream in pain. He was then asked where the receipts and valuables were. P.S. answered, but the intruder kept pressing the object against his left eye area and causing him to scream. When the man asked why he should stop doing what he was doing, P.S. insisted he had told the truth about all the places he had money.

After some time passed during which the intruder apparently moved away from P.S., one of the assailants returned and pulled down the boxer shorts P.S. was wearing. Someone grabbed his penis, held the sharp object against it, and threatened to cut it off. When P.S. screamed, he was told to be quiet or the children would wake up. Then the person stopped and said, "'Your wife is so beautiful. Let me see how much you love your wife.'"

Jane Doe One, who had had her head covered with a towel or other heavy material, could hear the exchange between the intruder and her husband. The intruder then came to her, pulled off her pajamas, and began touching her hips. She struggled; he held her down with his leg and penetrated her vagina twice with his finger. After he stopped touching her, he said she was beautiful. He then returned to P.S. and again demanded money. While this was going on, Jane Doe One could hear another person in the room, taking things from the closet.

All told, the intruders were in the home approximately an hour to an hour and a half. They ransacked the house, cutting open furniture and pulling up part of the rug. They took jewelry, identification, credit cards, a digital camcorder, approximately $2,000 in cash, and one of the couple's cars. They cut the home telephone line and took the couple's cell phones.

Authorities found footprints in the orchard across the street from the residence, and tire marks going eastbound. The couple's vehicle was found later that morning about a quarter to a half mile east of the residence. The couple's camcorder was recovered from Silva's residence after the arrests in this case, and he was shown on the videotape it contained.

### Counts 5-9-July 15, 2003

At approximately 4:30 a.m. on July 15, 2003, four intruders, each with a flashlight and two with guns, broke through the front door of the Modesto residence shared by Ramon Mechuca, Francisco Hernandez, and Jose Hernandez. One of the guns was pointed toward Mechuca's

3

forehead; it was black and the front part was "kind of squarish." Francisco Hernandez tried to escape through a window, but one of them grabbed him and threatened to kill him if he did not get down on the floor and pay attention. Mechuca, who was facedown on an air mattress, had his wrists and ankles bound almost immediately with black plastic ties. A blanket was pulled over his head. Francisco Hernandez was also tied up and placed next to Mechuca, and his head was covered with the same blanket.

One of the intruders, who spoke broken Spanish to Mechuca and the Hernandezes, demanded to know where the money and drugs were. When Mechuca said they had no drugs, the intruder threatened to start cutting them and then said some things in English, which Mechuca did not understand, to another person. Mechuca told them where his wallet was; they took the approximately $38 it contained and a silver ring Mechuca was wearing, and broke the men's cell phone. They also beat Francisco Hernandez, causing the blanket to come off Mechuca's head and allowing him to see Morrison's now-uncovered face .  Morrison said, "'He saw my face,'" and "'Let's kill him .'" The blanket was placed over Mechuca again, and he was hit in the head and kicked in the ribs. He pretended to be unconscious so the intruders would not strike him anymore. Mechuca suffered injuries to his left ear. Francisco Hernandez was beaten with a frying pan and sustained facial injuries. The intruders overturned the couch onto Mechuca's and Francisco Hernandez's backs and jumped up and down on it while laughing. After the intruders removed the couch from the men, they left with Jose Hernandez, and Mechuca could hear shouts as they beat him.

The intruders remained in the house for about an hour to an hour and 45 minutes. After they left, Mechuca dragged himself to Jose Hernandez's room. Jose Hernandez, whose hands and feet were bound, was covered with a bloody pillowcase and said he was choking. Mechuca, who was still bound hand and foot, used his mouth to remove the covering. He then saw that Jose Hernandez was "full of blood" and bleeding from his head. An ambulance subsequently took Jose Hernandez to the hospital.

### Counts 10-11-July 21, 2003

Around 7:00 a.m. on July 21, 2003, Christine Baker and her husband, Richard, were working in the walnut orchard surrounding their house in Delhi when they saw a small, magenta-colored car go up and down the road two or three times. When the Bakers reentered the house at 8:00 a.m., two men, each with a gun, told them to get on the floor. When they complied, kitchen aprons were put over their heads, and their wrists and ankles were bound with black plastic straps.

The intruders were dressed all in black and were wearing black ski masks. At least one was wearing what appeared to be unscuffed, black lace-up boots with ridged soles. The intruders said that if the Bakers cooperated and stayed quiet, they would not be hurt. Although their tone was polite, they constantly demanded the location of the Bakers' money, safe (which the Bakers did not have), and other valuables.

The intruders remained in the house for 45 minutes to an hour after the Bakers returned from the orchard. They ransacked the premises, cut the telephone lines, took slightly more than $1,000 in cash, as well as jewelry and coins, and also took the couple's car. After they left, the Bakers discovered that one of their bedroom windows was open wider than it had been when they went to the orchard that morning, and the screen was on the bed.

Later that day, the Bakers' car was found in an orchard about three miles from their house. Other vehicle tracks less than 10 feet away ran along a canal bank on the edge of the orchard and appeared to go northbound. Authorities recovered some of the couple's belongings following the arrests in this case.

4

**Counts 12-14-July 24, 2003**

A little before 2:00 a.m. on July 24, 2003, Cynthia and William Gibbs were in the master bedroom of their Turlock home when they heard a loud crash and breaking glass. As the couple exited the room, they were confronted by at least two people who shined flashlights in their eyes, said they were the Turlock police, and ordered them to the ground. It appeared to Ms. Gibbs that they were wearing dark clothing. At some point during the incident, she saw a black boot that looked like a motorcycle or heavy work boot.

When Ms. Gibbs said they were not the police and told them to get out of her house, the intruders pushed the couple to the floor. At that point, someone was sitting on Ms. Gibbs's head and her chin was on the floor. Someone turned on the lights, and she saw a dark handgun with no cylinder lying near her face.

As Ms. Gibbs lay facedown, a person bound her hands behind her back with a black zip tie that was pulled extremely tight. When he moved off her head and went to bind her feet, she called out to her children to call 911. The person then punched her and knocked her head to the ground. A gun was put to Gibbs's temple, and he was told that if his wife did not get quiet, things could get really, really bad. The hand holding the gun was wearing what looked like a gray garden glove; the gun had a dark barrel and looked like an automatic. Gibbs also saw a gray shoe, with the material of the upper portion in a cross-weave pattern. Ms. Gibbs did not say anything else, and the person finished binding her ankles and put a house dress over her head. Gibbs was also bound at the wrists and ankles with zip ties, and a towel was placed over his head.

During the incident, Ms. Gibbs heard three voices, all of which she believed were male. [Footnote] Sometimes the intruders referred to one another by a racially derogatory term. Despite the use of the epithet, the intruders did not sound African-American to Ms. Gibbs. Because of how they sounded and the racial slur, however, Gibbs thought at least some of them might be. He heard three different male voices. One seemed to be the leader, one seemed to be in charge of enforcement, and the third kept lookout. One was very polite when addressing him.

The Gibbses ran a business from an office on their property, and the intruders wanted to know where Gibbs kept the money he paid his employees. The leader used a knife to unbind him, and he was escorted out to the office, which was off of the garage. His head remained covered. Once inside the office, he was placed in front of the safe and told to open it, which he did. A coin collection and .25-caliber Derringer were taken from the safe. Gibbs was then escorted back to his previous location in the house, but this time, his hands and feet were bound with duct tape. When Gibbs could not figure out how to put his hands, the intruder he believed to be the leader told him to put them together like he was praying.

At some point, one of the intruders entered the room of the Gibbses' daughter. This person shined a flashlight in her face and demanded to know who lived in the house and whether she had a cell phone. He had a gun that was a dark grayish color, with an overall length of six to eight inches. She thought it may have been a revolver. He pointed it directly at her head. Later, she was able to see that he was wearing a black ski mask, black jeans with a silver clip on the right front pocket, a long-sleeved black shirt, and black combat-style boots.

The Gibbses' daughter was restrained by the use of black zip ties around her wrists and ankles. One person took her by the arm and walked her to her brother's bedroom and put a blanket over her and her brother's heads. Her brother, who was also bound with zip ties, saw that the person who restrained him had a clip for a knife in his right pocket. The young man heard three male voices that sounded African-American. He had the impression that one, who spoke in

5

more of a whisper, was the leader.

The intruders remained in the home for at least two to two and a half hours. Before they left, they put socks in the Gibbses' mouths and wrapped duct tape around their heads. They also disabled the telephones. They ransacked the place and took jewelry, a gun, other items, and the family's car. It was recovered later that day a short distance away. Three distinct shoe print patterns were found in the dirt by the car, one coming from the driver's side and two coming from the passenger side. The length of the strides was consistent with someone running. The shoe impressions appeared to be fresh, and led along a house to where it appeared, from tire tracks, that another vehicle had parked. Similar shoe impressions were found in front of the Gibbs residence. Boots subsequently seized from Silva could not be excluded as the source of some of the impressions, and most likely were the source of one of the impressions.

Ms. Gibbs sustained a cut mouth and bruises from being punched. In addition, she had ligature marks on her wrists and ankles, numbness in her hands that lasted about six weeks, and numbness in her legs that did not last as long. Authorities recovered some of the family's belongings following the arrests in this case.

### Count 15-August 4, 2003

In August 2003, F.G. resided in Merced with her husband, Z.M., and son. She had a small business selling jewelry to people in their homes. She kept the jewelry in a safe in her kitchen. In late July, Morrison had twice come to the house to ask about a car F.G. had for sale.

Around 3:30 a.m. on August 4, F.G. and her visiting sister were asleep in the master bedroom when someone entered through the bedroom window. F.G., who saw only one person, screamed for her husband, who was sleeping in the living room. The intruder, who had a gun pointed at her face, told her in English to lie on the floor. The women obeyed and the intruder bound them at the wrists with black plastic.

When Z.M. heard his wife scream, he ran toward the bedroom. He saw two subjects, both of whom were armed and carrying flashlights. One had a black semiautomatic; the other, a chrome revolver with a long barrel. The one with the semiautomatic pointed it at Z.M., causing him to back out of the bedroom. The intruder followed him out and told him to get on the ground. This man was wearing some type of black sweater, a ski mask with holes for the eyes but not the mouth, and what looked like work boots or hiking boots with soles that were not very thick. A short time later, the other man also came out of the bedroom and pointed his gun at Z.M. This man was wearing a ski mask and black clothing. One of the intruders told Z.M., in English, that if the police arrived, the intruders would kill everyone.

The intruders placed Z.M. facedown and bound his wrists and ankles with black plastic bands. At some point, a small bed sheet was thrown over his head. One of the intruders took a gold ring off Z.M.'s finger. One of them placed his knee on Z.M.'s back, pressed a knife blade to the back of his neck, and demanded money. Z.M. responded that they had no money in the house because they had been burglarized three months earlier. The intruder began cutting Z.M.'s neck and threatened to kill him.

At some point, a third intruder with a gun entered the house. F.G. saw that the shoes of one intruder had a black, U-shaped design on top, toward the toe. She and Z.M. both heard at least one use a racial slur when talking to another. Based on the eye color and skin tones Z.M. had been able to see, as well as the one's terminology, Z.M. formed the opinion that two of the intruders were Hispanic and one was African-American. The African-American was the one with the silver revolver.

6

F.G. heard one of the intruders talking on what she believed was a cell phone. The man asked, in broken Spanish, which one was the woman who was going to open the safe. F.G. recognized the voice that replied on the cell phone and described her as being that of a former boyfriend who knew where she lived and about her jewelry business. A short time later, she was taken to the kitchen and struck in the face, whereupon she opened the safe. Her face was then covered with a towel. After the intruders went through the safe, F.G. ended up in the living room, where her breasts and vagina were touched over her clothing. Someone tried to rip off her shorts, but desisted when she struggled and yelled.

The intruders were in the house for about 30 minutes. They ransacked it, cut the telephone lines, and took everything of value, including the jewelry F.G. had had in the safe, which was worth $80,000 to $100,000. Authorities recovered some of the jewelry following the arrests in this case. Also recovered was some of the jewelry that had been taken in the earlier burglary, which had occurred when no one was home.

### Counts 16-17-August 7, 2003

In August 2003, Renae Frye and William Cozine lived in Turlock. They sold small statuary and yard ornaments, some of which were kept in their front yard.

Around 12:45 a.m. on August 7, three men, wearing ski masks with openings for the eyes and lips, dark clothes, gloves, and black footwear, walked through the open front door with guns drawn and ordered the couple to the floor. [Footnote] When they complied, Frye was told to put her hands behind her like she was praying. The intruders tied their wrists and ankles with large black zip ties, and covered Frye's face with a towel she had had on her hair and Cozine's head with a blanket that had been on the couch. They pepper-sprayed Frye's small dog when it became aggressive, and demanded to know where the drugs were. The couple, who had no drugs, told the intruders they were at the wrong house. The men then started asking for "big money." [Footnote] After Cozine replied that it was in the bank, one of the intruders had Frye open the safe.

Frye neither heard a car arrive at the residence before the robbery nor leave the residence afterward. The only voices she heard during the incident were male. Although she was so frightened that she could not tell whether any of the voices had what might be termed an ethnic accent, for some reasons she thought the intruders were Spanish. The intruders were polite when addressing her and Cozine, but called each other slang and racially derogatory names.

The intruders were in the house for 45 minutes to an hour, during which time they ransacked the premises and cut the main telephone line. They took jewelry, $8,000 to $12,000 in cash that was kept in various locations throughout the house, and the couple's cell phones.  Authorities recovered the cell phones following the arrests in this case.

### Counts 18-20-August 11, 2003

In August 2003, Vicki and Kenneth Myers resided in Delhi. Although the couple owned a Laundromat and a ministorage facility in town, neither was operated out of their home.

At around 3:00 a.m. on August 11, at least three men broke open the front door to the house. At least two had guns; all were wearing dark clothing and had their heads covered. Two shined flashlights in the couple's faces, and one put a gun to Myers's face.

The intruders immediately told Ms. Myers to put her hands behind her back like she was praying. When one of her small dogs became aggressive, the intruders sprayed something at it and it fled. The intruders then covered Ms. Myers's head with her bedspread and used black zip

ties to bind her wrists and ankles. Two of the intruders took hold of Myers and told him to turn over on his stomach and put his hands behind his back like he was praying. One struck him in the back of the head a couple of times with what felt like a fist, while the other restrained his wrists and ankles with black zip ties. His head was then covered with his blankets. Myers was able to see that at least one of the intruders was wearing black lace-up boots, while one had a black and green camouflage scarf wrapped around his face and a black baseball-type cap with the bill facing backwards. At some point, Myers observed that another was wearing a white tennis shoe with a black stripe and a red stripe running horizontally the length of the side of the shoe.

The intruders asked where the jewelry, money, and valuables were. They also wanted information about the couple's businesses, and threatened to hurt the Myerses' daughter, whom they knew lived at the ministorage facility. They also appeared to know the receipts for the ministorage were deposited on Mondays.

At one point, one of the intruders cut Ms. Myers's finger to the bone, apparently accidentally, when repositioning her bound hands. One of the intruders threw the blanket off of her body, leaving her head covered, then jerked her panties as if he was going to pull them down. He stopped, however, and covered her back up.

Myers could hear the intruders ransacking the bedroom. When they found the safe in the closet, they put Myers on his knees, put a gun to the back of his head, and clicked the gun twice. He told his wife that they were going to kill him and that he loved her; she begged them not to do it. They then forced Myers to open the safe, after which one of them kicked Myers in the back a few times with what felt like a boot. The man kicking Myers told him, "'Just remember that all black people aren't bad.'" Although the intruders referred to one by a racial slur when addressing each other, they did not sound African-American to the couple.

The intruders remained in the house for approximately 45 minutes. They cut the telephone lines to the residence, and took jewelry, money, a rifle and a side-by-side Browning 12-gauge shotgun, and a cell phone. It was subsequently discovered that someone apparently had parked in the orchard beyond the fence near the southwest corner of the property. There were a number of shoe prints in the area. Very shortly after the incident ended, Myers saw a car driving across the back of the property on the frontage road. Because it was still dark out, he could not ascertain its color or identify it in any way.

The following day, Ms. Myers saw a newspaper article about another home invasion. Anyone with information was asked to call Detective Campbell of the Stanislaus County Sheriff's Department. Ms. Myers called the number given to inform Campbell that such things were also occurring in Merced County. Authorities recovered some of the Myerses' belongings following the arrests in this case.

### Counts 21-23-August 11, 2003

In August 2003, Steve Christy resided in Hughson. He managed Modesto Farmers Market and 16 acres of grapes adjacent to his property. His house had an alarm system, but it was not connected to the sheriff's department or other agency.

At approximately 4:30 a.m. on August 11, he was awakened by what sounded like an explosion and the alarm going off. As he ran toward the front door, he saw three people who had broken down the door and were entering the house. The intruders each shined a flashlight in his eyes and pointed a gun at his head and told him to turn off the alarm. The intruders all wore dark or black coveralls, dark masks with holes for the eyes and mouths, and plain dark gloves. One was wearing white tennis shoes with a little bit of blue on them.

8

Once Christy turned off the alarm, the three ordered him back into the bedroom, told him to put his palms together, restrained his wrists with a plastic zip tie so tightly that his hands began to swell, and placed him facedown on the floor next to the bed. A towel was placed over his head.

Christy did not hear the intruders talk to each other. Instead, one particular intruder did all the talking to Christy. This man spoke politely in a low tone of voice, and asked where the money was. When Christy told him, he asked for the safe. When Christy truthfully responded several times that he did not have one, a foot or a hand was placed on the back of his neck, something was pointed at the back of his head, and the intruder again asked where the safe was and said he would "'blow [Christy's] brains out.'" Christy heard a click from the gun behind his head, then the intruder who was talking to him told him to get up. They then went out to Christy's shop, which was about 100 feet from the main house.

Once inside the shop, the one intruder again asked the location of the safe. Someone started looking through the shop, while another intruder struck Christy near his right kidney with what felt like a fist, knocking him unconscious. When he regained his senses, one of the intruders helped him back into the house.

All told, the intruders were at the house around an hour to an hour and a half. They ransacked the premises, cut the telephone line to the house, and took jewelry belonging to Christy's late wife, about $300 from his wallet and $990 in cash that had come from the farmers market, a Browning 12-gauge shotgun and a .38-caliber revolver, and some other items.

Boots seized from Silva could not be excluded as the source of a shoe print found on the dirt road leading from the house next to the Christy residence. Authorities recovered Christy's shotgun and some of his other belongings following the arrests in this case.

### Counts 24-29-August 12-13, 2003

In August 2003, Jane Doe Two, her husband M.J., and their two children, T. and M., both of whom were young adults, resided Ceres.  The family owned two businesses, one in Oakdale and the other a limousine service that they ran from an office situated between their house and shop.

At approximately 3:30 a.m. on August 12 or 13,  M. was in the family room, awake, when he heard the outside door in his bedroom open, then saw some flashlights and three people. He pretended to be asleep, but one of the intruders came over to him, said he had been watching and knew he was not asleep, and told him to get up. M. was then struck on the back of his head with something hard and went to the floor.

Another intruder, who had a gun and was dressed all in black, went to the master bedroom, where Jane Doe Two and M.J. were sleeping. Jane Doe Two, who was dressed in her bra and underwear, was awakened by the intruder shining a flashlight in her eyes and telling the couple to get out of bed. When M.J. turned, the man hit him over the head with a gun, drawing blood, and then put the weapon to M.J.'s head. Towels were placed over the couple's heads, and they were led to the room where M. was. As she passed the room of T ., who was seven and a half months pregnant, Jane Doe Two looked in and saw another intruder, also dressed completely in black, getting the young woman out of bed. This person had a flashlight and a gun. All told, there were three intruders in the home; all wore black boots and full masks over their heads. The masks had eye holes. [Footnote] Jane Doe Two heard only male voices.

Once in the living room, Jane Doe Two sat down on the floor. Her son was going to the floor as a man hit him on the head with a handgun. The intruders then threw a blanket over him.

M.J. was also in the living room, and then T. was brought in. T. lay on the floor as she was told, then a gun was placed to her temple and she was told that if she moved, the intruder-who used a racial slur in referring to her-would shoot her.  A blanket was placed over her head and her wrists and ankles were bound with phone cord wire. M. was also bound with some sort of wire at the ankles and wrists. During the incident, T. saw two guns, both handguns. M. also saw two guns, at least one of which was a handgun.

Jane Doe Two was situated facedown on the living room floor. She was bound at the wrists and ankles with telephone cords and her head was covered. Someone ripped two rings from her fingers. Although Jane Doe Two was unsure whether this person was wearing gloves, she believed, based on his accent, that the man who was with her most of the night was Hispanic. One of the intruders, who was wearing gloves, took M.J.'s wedding ring.

M.J. was facedown on the floor. His wrists were bound with electrical cords from appliances in the house and his head was covered with something. One of the intruders wanted to know the location of the money and valuables. Someone held a gun to M.J.'s head and said they would blow it off if he did not tell them where everything was. M.J. heard the gun click several times while it was held to the back of his head. M.J. took them to the bedroom and showed them where the jewelry and guns were. The intruder then returned M.J. to the other room and laid him back down. At some point, one of the intruders said the family did not grow up like he did and were not raised on chitlings. M.J. also heard what sounded to him like gang talk. When the intruders walked past him, they kicked him in the head three times and once in the side. At least one was wearing black boots.

The Hispanic-sounding man told Jane Doe Two that her story about where the money was at had better match her husband's. He untied her and took her to open the safe, which was in the weight room. He then took her to the office, where a money box was kept. At some point, another intruder joined them. Jane Doe Two opened the money box, which contained $34, whereupon the intruder she believed was Hispanic cut off her underwear and undid her bra. She fell to the floor and he started asking her questions about whether she had ever cheated on her husband and how old her children were. Hoping they would leave, she told them that she had a limousine driver who was due. She could tell, from the tones of voice, that they were angry she had no money. Although she no longer had a towel over her head, she did not look at the intruders because she was afraid if she did so, they would kill her.

The intruders took Jane Doe Two back into the living room. The Hispanic one started rubbing her breasts and asking if they were real. Next, he tied her back up, facedown, although he did not retie her feet. He then stuck the gun in her vagina and told her husband he would "'blow her up'" if M.J. did not tell him where the money was. Jane Doe Two screamed, and the intruder removed the gun from her vagina and put it toward her posterior, although the gun did not actually penetrate her anus. He then untied her again and stood her up. He told M.J. that he was going to take her with him, and he put her over his shoulders and carried her outside.

The Hispanic intruder took Jane Doe Two to the deck, where there was a hot tub. From things he said to her, such as accusing her of being prejudiced, she believed he was trying to make her think he was African-American. He wanted to know where the money was and twice stuck her head underwater in the hot tub.

While this was going on, M.J. was brought out to the hot tub. He had been kicked in the head a few times and was bleeding.  The intruders demanded to know where more money was at, but there was no more money. One intruder held him by the back of his neck and tried to dunk him, but M.J. resisted. He then let his head be dunked in order to avoid a beating. M.J. managed to free his hands and straighten up, but one of the intruders punched him in the side of the face and the intruder who was with Jane Doe Two pointed what looked like it might be a

black nine-millimeter semiautomatic at M.J .'s face. M.J. capitulated and his hands were retied. At one point, an intruder grabbed M.J.'s head, which was bleeding, and asked Jane Doe Two, " 'Is this your husband?'" She was screaming and crying and said yes. An intruder dunked Jane Doe Two's head one more time, then the couple was taken back into the house.

Jane Doe Two was not retied. Her head was shoved down into the love seat so that her naked posterior stuck up in the air. Every time she tried to sit down, an intruder would put her back up. At one point, two of the intruders were laughing and one of them pantomimed having intercourse with her. A dildo was thrown at her, and the Hispanic intruder told her to use it. When she did not want to touch it, the two intruders moved her into T.'s room, where they placed her on the bed, face up. One of them put a pillow over her face. They encouraged her to use the dildo on herself, then one of them inserted it into her vagina himself and moved it in and out. At the same time, the first one fondled her genitals with his hand. She was crying hysterically; when the intruders told her to shut up, she told them that she could not breathe. When the intruder placed the dildo against her posterior, she said that there was something wrong with her. They stopped at that point and tied her up in the living room again.

At some point after the hot tub incident, one of the intruders received what sounded like a call on a cell phone. He spoke to someone, but Jane Doe Two could not tell what he said because she was crying. When the intruders left, they used the back door, which was in M's room. All told, they were in the house some 45 minutes to an hour, during which time they ransacked the family's belongings. They disabled the telephones and took jewelry, $34 in cash, a shotgun, a .22-caliber rifle, two handguns, and a knife. Authorities recovered some of these items following the arrests in this case.

The family subsequently received medical treatment for their injuries. Jane Doe Two was somewhat disoriented and sustained bruises on her arms, legs, and ankles. She also experienced some vaginal bleeding. T.'s wrists were injured by the cords being wrapped around them. M. suffered a minor concussion and received either staples or stitches to close his head wound. M.J. sustained injuries to his face and head that required stitches and left a permanent scar.

Several sets of footprints were found along the canal bank. Boots seized from Silva could not be excluded as the source of some of the prints. Boots seized from Martinez could not be excluded as the source of another of the prints. In addition, one print appeared to be of a tennis shoe type, with a heel that appeared to be split, somewhat like a horseshoe.

**Counts 30-31-August 14, 2003**

At approximately 1:20 a.m. on August 15, 2003, Marcos Renteria was asleep in his Ceres residence when he was awakened by a loud noise coming from the attached garage. Renteria arose and managed to partially dial 911 on his cell phone, but before he could complete the call, someone kicked down the door to the bedroom. Renteria saw two intruders, both with guns drawn on him and with flashlights. One gun was shiny, probably chrome, and square. Renteria did not think it was a revolver. The intruders were wearing dark clothing, black combat boots, and had handkerchiefs covering the lower halves of their faces.

When the intruders entered, they turned on the bedroom light and started yelling at Renteria in English to get down.  Both voices were male. One of them demanded to know who he was calling, then grabbed the phone and threw it on the ground.  When Renteria said they could have anything, one of them said, "'Anything?'"  One then hit him over the head with a metal flashlight and both began punching him.  A burning liquid was sprayed at his face, and he was struck with a flashlight more than once.  One of the intruders put the square gun to his head, and Renteria grabbed it and tried to wrest it from the man's hand. He almost succeeded, as the

11

intruder was wearing gloves that were a little too big for him. At some point, one intruder's mask came off or Renteria pulled it off.  It was Martinez. The other intruder said, "'Shoot him, Bro.'"

Although bleeding heavily, Renteria fled to the garage. He pushed the button to raise the car door and managed to lift it a bit, but the intruders caught up to him and started punching him again. The intruders pushed Renteria back inside the house, but he managed to evade them and dive underneath the garage door. He then started running to his shop, which was 150 to 200 feet away. Renteria could tell the intruders were following him, then he heard shooting. Several shots struck him, then some of his workers came to his aid. Renteria saw some lights moving away from the house, toward the canal. It appeared the intruders were running with their flashlights. Renteria estimated they had been on the premises about an hour. To his knowledge, nothing was taken from the house.

Renteria was shot four times. His injuries required prompt medical attention and surgical repair to prevent loss of limb or death. Subsequent DNA testing showed his blood on Silva's boots. In addition, Silva's boots could not be excluded as the source of a shoe print found at the scene.

## Counts 32-35-September 10, 2003

In September 2003, Homer Garza, Sr., resided in Denair, with his wife Virginia, 14-year-old daughter Melissa, and 23-year-old son Homero, Jr.  Garza, a farm manager, had an office at his residence, as well as one at his work site. An alarm system that was connected to a security company and the sheriff's department had been installed at the house on September 9.

At approximately 2:20 a.m. on September 10, Garza got up to see his wife off to work and to check on some water he had running in his orchard. Everything seemed fine. Around 3:30 a.m., he was asleep when the house's alarm went off. Thinking there was a problem with the installation, he was hurrying to turn off the alarm, the control panel for which was by the front door, when three men entered the house by breaking open the dead-bolted front door. One held a shotgun to Garza's head and said that if he did not quickly turn off the alarm, the intruder would "'blow [his] brains out.'" The intruder repeated this and banged Garza's head with the butt of the shotgun multiple times. Garza was able to tell the intruders were wearing masks, but could not make out what kind because the individual with the shotgun also was shining a flashlight in his face.

Garza managed to turn off the alarm. The intruder, who was wearing gloves that felt like latex, grabbed him, took him into the living room, and told him to drop to the floor and put his hands together behind his back, as if he was praying. Garza's hands and ankles were restrained with black plastic ties and his head was covered with one of his wife's shirts.

As one of the intruders ran down the hallway toward the children's rooms, another one put his foot to Garza's neck, applied pressure, and asked him where the money was. The shoe felt heavy. The intruder told Garza that his son was in blood, and that if he loved his son, he would tell where the money was. Garza said there was money in his wallet in the laundry room. The intruder then asked where the "clavo" was. In the Spanish culture, "clavo" is a slang term that means "stash."  Garza understood it to mean money or jewelry, and he told the intruder that he did not know what he was talking about. The intruder then got angry and kicked Garza in the side of the face.

Meanwhile, Homero was awakened when his locked bedroom door was kicked in. What appeared to be a shotgun and a flashlight were pointed at him by a person wearing what looked like black military boots and black pants with pockets on the side. He could hear the alarm in the background. It went off after 15 to 25 seconds. Homero was told to lie facedown on his

stomach and put his hands behind his back in a praying position. He complied, but, due to his size, the intruder had trouble holding his hands together, so another person came and helped. Homero's wrists and ankles were restrained with black zip ties and a blanket was thrown over him. He could hear three male voices. The intruders spoke in English, except that Homero, who understood Spanish, heard the Spanish slang term "ese" four or five times when one intruder addressed another. The two intruders in his room used the term and seemed to have Hispanic accents.

Homero heard one of the intruders tell his sister to get up and then to get on the ground. He then heard what sounded like someone being struck. Although he did not hear his sister make any sound, he yelled out not to hurt her, that she was only 14. The intruders repeatedly asked Homero where the money was; when he insisted there was no cash in the house, he was kicked a few times in the back of his head with something that felt sturdy, like a boot. The intruders said that if he was lying, his father was going to get hurt worse, and that Homero should look at him, that he was bleeding all over. Homero knew they were lying, because he could hear his father and had not heard him being struck or asking not to be hit.

Eventually, one of the intruders asked Garza how to turn off the front lights. Garza told him the location of the switch, then heard a car nearby that sounded like its muffler was torn up. The car was leaving. The incident lasted 30 to 50 minutes, during which the house was ransacked and the telephones disabled. The intruders took a number of items, including jewelry, CD's, money, and a video camera. Authorities recovered some of the items following the arrests in this case.

Garza suffered cuts and bruises to his head and face from being kicked and struck with the gun butt. He also had bloody marks on his ankles from having his feet tightly bound. Melissa sustained a facial abrasion and marks on her wrists and ankles. Homero had marks on his wrists and ankles that were visible for about a month. None of the family sought medical attention.

Shoe prints were found between the residence and the road. Boots subsequently seized from Silva could not be excluded as the source of some of the impressions. Boots subsequently seized from Martinez could not be excluded as the source of other of the impressions. There were tire tracks in the orchard near the house that appeared to go from Swanson Road, into the orchard, and then out onto the road again. The shoe prints led toward the area where the tire prints were found.

### Counts 36-37-September 10, 2003

Early on the morning of September 10, 2003, Stanislaus County Sheriff's Detective Nuno was assigned to be part of the arrest team, if residential robbery suspects, who were under surveillance, committed a robbery. Sergeant Allen, who was the team supervisor, was with Nuno in one vehicle, while the rest of the SWAT team and a couple of other detectives were in other vehicles. Nuno and Allen were in an unmarked car that was equipped with lights and a siren. Nuno was driving.

At approximately 4:30 a.m., Nuno and Allen were at the staging area in Hughson, when they received information that the individuals were believed to have committed a residential robbery in the area. [Footnote] The surveillance team reported the suspects' location; Nuno had previously been informed that the suspect vehicle was brownish or golden and had the words "Cold Pimp'n" on the back.

Nuno and Allen, who were in the lead vehicle, and the rest of the arrest team moved to intercept the suspects. Once the team was in position, Nuno activated his lights and siren. The

13

suspect vehicle slowed down as if it was going to stop, but then accelerated. A pursuit ensued that covered seven to 10 miles and lasted approximately 10 minutes.

Nuno followed the vehicle from a rural area into a residential neighborhood in Turlock. There, the car slowed down and began making turns. The rear doors opened a couple of times, then, in the vicinity of 550 Angelus, near Angelus and Spruce, the vehicle slowed almost to a stop. Nuno slowed down as well, and pulled toward the driver's side passenger area of the vehicle. The right rear door opened completely, and Martinez got out. He was wearing black clothing, a black beanie-type hat, black boots, and a bandolier, and had a shotgun in his hand. As he turned toward Nuno and Allen, the shotgun also turned in their direction. Allen opened his door, stepped half out of the car, which was still moving, and fired several shots at him. Because Allen was behind the door of the car and the window was not rolled down, he fired through the window, which shattered. The shots also damaged the vehicle's outside mirror. The Cold Pimp'n vehicle was about 10 to 15 feet in front and to the right of his and Nuno's position at that point. As Martinez ran toward a residence on the south side of Angelus, Allen reacquired the target, stood up, and fired again. He was standing behind the door of his and Nuno's car, which was now slightly rolling away from him.

Immediately after Allen fired the second time, he and Nuno heard loud booms, which Allen believed to be gunfire. They were coming from the suspect vehicle, toward Allen. Allen had stepped out of the car in which he had been riding, and was standing right next to it. He was still somewhat in the doorway, with the car moving away from him. When he first heard the gunshots, Nuno's car had not completely cleared his position. The suspect vehicle was still in front of Nuno's car, approximately four to five car lengths away. The lower driver's side portion of Nuno's windshield broke, and he realized he was being shot at. Glass from the windshield cut his left cheek, and the bullet, which struck the driver's side door frame, was probably inches from his face. Nuno heard several booms. Allen heard two or three shots. Nuno was not sure which shot hit the windshield, but it was neither the first nor the last.

As this was going on, the suspect vehicle started to move. Nuno accelerated to catch up to it, and Allen followed Martinez.  At the intersection of Angelus and Spruce, approximately 100 yards from where Martinez had exited the vehicle, the two passenger side doors opened. As the car was either completely stopped or moving slowly, Morrison got out of the rear passenger side. Nuno did not see anything in his hands. Silva got out of the front passenger side. He was dressed in dark clothing and holding a chrome-colored handgun.

Because Silva was holding a firearm, Nuno positioned his car at an angle and began to shoot at him through the broken-out passenger window. He could not tell whether any of his shots struck Silva, who disappeared into the darkness, as did Morrison. Having lost sight of them, Nuno came around the driver's side of the suspect vehicle, at which point he saw the driver exit. It was Fouse. Nuno gave chase as she ran into a yard across the street, then took her into custody without further resistance.

Fouse was taken into custody around 4:45 a.m. A subsequent search of the vehicle revealed a number of items that the Garzas later identified as belonging to them, as well as a black baseball cap and black ski mask. The ski mask had two eyeholes, and a mouth opening that had been closed by some means. A camouflage hood was found on the rear floorboard. A shotgun was found in the front yard of the residence at 550 Angelus, where Martinez had jumped the fence into the backyard and fled from Allen. In the backyard was a bandolier with shotgun shells in it.

After receiving information concerning Silva's whereabouts, Ward assisted in taking him into custody about 5:30 or 6:00 a.m. Silva was hiding in the carport of the residence at 733 South Orange Street. When apprehended, he had a cell phone in his hand. Eight black plastic zip ties,

each individually secured in a loop, were found underneath the vehicle where Silva had been hiding. Although Silva only had a pocketknife on his person, two black nine-millimeter magazines for a semiautomatic weapon were found in the backyard of the residence, about 15 to 20 feet from the carport. One contained 10 rounds and the other contained nine. A black Browning High-Power semiautomatic handgun with a magazine in it was subsequently located in the backyard of the neighboring residence at 720 Spruce. The two backyards were separated by a fence with a gap in it, and the two magazines were some six to 10 feet from the black handgun.

Although the black handgun was photographed where found and Deputy Luck, then a Stanislaus County Sheriff's Department trainee, was assigned to watch the evidence in the area, the gun was no longer there a couple of hours later when sheriff's personnel returned to collect it, and Luck was no longer in the immediate area. A resident of the house agreed to assist Deputy Reed, Luck's field training officer, in trying to recover the handgun. The following day, this person directed Reed to an apartment complex in Turlock and retrieved what appeared to be the gun. A check of the weapon's serial number revealed it had been taken in the Lasater robbery. Subsequent comparison revealed that one of the unfired cartridges in the magazines found in the backyard at 733 South Orange most likely was cycled through this gun.

A silver-colored Smith and Wesson .357-caliber revolver was found in an adjacent backyard at 717 South Orange.  The revolver, which was capable of holding six rounds, contained six empty shell casings.

Nuno assisted in capturing David Michael Silva, who was hiding in a duplex laundry room on Spruce, near Angelus. David Michael Silva was taken into custody between 6:00 and 7:00 a.m. Just before 8:00 a.m., Stanislaus County Sheriff's Detective Cook found Martinez hiding in the backyard of the residence at 364 South Avenue, at the corner of South Avenue and South Orange Street. A black zip tie and a loaded Mossberg 12-gauge shotgun (also known as a Moss) were recovered from the area in front of the residence at 550 Angelus.  A black strap containing 12-gauge shotgun rounds was found in the backyard of the residence.

Around 1:30 p.m., the SWAT team was directed to 653 South Avenue. Morrison was inside the residence with several other individuals and was taken into custody

### Additional Evidence

Detective Campbell, who became the lead investigator on the day of the Gibbs case, began to focus on Morrison, Silva, and Martinez as potential suspects shortly after the robbery of M.J. and Jane Doe Two. On about August 13, members of the Stanislaus County narcotics task forces were asked by the Stanislaus County Sheriff's Department to assist in surveillance of suspects in a series of residential robberies.

Richard Balentine, an investigator for the Stanislaus County District Attorney's Office, was part of the surveillance team for approximately 22 out of the 27 days the surveillance lasted, and also spent three days monitoring intercepted conversations in the so-called wire room. Martinez, Silva, and Morrison were three of the individuals targeted for surveillance, and were seen together on a number of occasions. During the surveillance period, certain homes and vehicles came to be recognized as being associated with them. Silva was associated with two residences, one at 20077 First Street, Hilmar, and the other at 3512 Woodglen Court, Modesto. He was seen driving a 1984 Buick Park Avenue, variously described as silver or brown, with large white letters spelling "Cold Pimp'n" in the back window. He was also seen driving a white 1999 Mitsubishi Eclipse convertible. On a few occasions, Virginia Ellsworth was seen in Silva's company, and also in his vehicle at his residence. Martinez was seen coming from, going to, and staying the night at 733 South Orange in Turlock, and he was occasionally seen

15

on Davis Court in Delhi, the same address on Woodglen in Modesto as Silva, and, near the end of the investigation, on South Carpenter Road. Martinez was associated with a green 1997 Dodge pickup. Morrison was seen going to, coming from, and staying the night at 16347 Davis Court, Delhi, the same address at which Martinez occasionally was seen. Morrison was associated with a gold Chrysler Intrepid. Morrison was often seen associating with Patricia Ramos.

Fouse was also under surveillance. Balentine twice saw her at the Woodglen address. On one of those occasions, August 30, she drove up and walked into the house, then came back outside with Silva and two other males. All four got into the Cold Pimp'n vehicle, which was not the car in which Fouse had arrived. Fouse got into the left rear of the vehicle; a Hispanic male got into the right rear; a white male who was carrying an object that Balentine believed was a shotgun or rifle got into the right front; and the car, which was driven by Silva, left the residence. On one occasion, Balentine saw her driving the Cold Pimp'n vehicle.

Early on the morning of August 15, the date of the Renteria incident, Agent Vieira of CalMMET was surveilling the First Street residence when, at 2:11 a.m., he saw the Cold Pimp'n Buick drive up and park in front of the house. A male dressed in dark clothing exited the driver's side of the vehicle and walked toward the front door of the residence. A minute later, a male wearing a gray shirt exited the residence and walked toward the front driver's door of the Cold Pimp'n car. He pulled what appeared to be a heavy black bag out of the right rear passenger side of the vehicle and carried it into the house. At approximately 2:14 a.m., the gold Intrepid pulled up and parked just in front of the Buick. A male, dressed all in black, exited the front passenger side door and walked up toward the front of the residence. Although Vieira could not tell if this man knocked or simply let himself in, he entered the residence. He returned to the gold Intrepid about a minute later and drove away. Another male came out of the residence and drove off in the Cold Pimp'n vehicle. Vieira could not tell whether this was either of the two men who previously had interacted with the Cold Pimp'n car. The vehicle left at approximately 2:15 a.m.

At approximately 9:50 p.m. on August 15, Balentine and one of the surveillance teams were southbound on 99 when Balentine saw Silva driving the white Eclipse convertible southbound into Merced. Morrison and Martinez were passengers in the vehicle. The three attended a party in Merced. At approximately 11:55 p.m., SDEA Agent Hoek and other officers were conducting surveillance at a residence in the southern Merced area when they saw the white Eclipse convertible leave. Silva was driving and had two passengers. The car went to the residence on Davis Court in Delhi. Two people got out. The vehicle, now containing only the driver, left after about two minutes.

At approximately 8:53 p.m. on August 18, Modesto Police Sergeant Van Diemen of the SDEA drove by the home at 733 South Orange, Turlock, and saw Martinez and Morrison in the front yard. He was aware the two were cousins.

At 11:59 p.m. on August 25, SDEA Agent Tovar was surveilling the Woodglen address in Modesto. As he drove by the residence, he saw Silva and Morrison standing in the driveway, talking to each other.

As a result of the surveillance, information was developed that caused Campbell and Hoek to obtain authorization for and initiate wiretap surveillance with respect to (209) 505-9835, for which Patricia Ramos was the subscriber but which Morrison used, and (209) 614-7098, for which Silva was the subscriber. Wiretapping was conducted from August 29 until September 10, with surveillance teams concentrating on the hours of 6:00 p.m. to 6:00 a.m. During a number of the intercepted conversations, the males referred to each other by a racially derogatory term or shortened variation thereof. Fouse became a target of the investigation

when her name came up in the wiretaps.

At 6:46 p.m. on September 1, a conversation between Silva and Morrison was intercepted in which a reference was made to Silva having "that black bag" on him because his "old lady" wanted it and was supposed to show somebody in Turlock. Later in the conversation, Silva said they could just "get in the tinted windows" and "do [their] thing."

Later that evening, at 8:45 p.m., the Cold Pimp'n vehicle was followed to a Taco Bell in Turlock. At 8:48 p.m., a conversation between Silva and his mother, Terry Silva, was intercepted. There was a reference to Silva and Fouse being together at a Taco Bell, and Fouse mentioned that Silva's girlfriend was her roommate. During the course of the conversation, Terry Silva said that someone had told her there had been a lot of things in the paper about home invasions. Silva replied that there had been, which was why he had stopped for a while. Terry Silva then told him that she wanted him to take anything he had out of her house and put it in his cars or something.

At 2:47 p.m. on September 2, a conversation between Silva and Morrison was intercepted. Morrison said that he wanted to pick up the jewelry and take it, because someone wanted to check it out. About half an hour later, the gold Intrepid arrived at the Woodglen residence. Approximately two minutes later, the white Mitsubishi Eclipse arrived. At 5:17 p.m., Agent Pettit, who was conducting aerial surveillance, saw the gold Intrepid meet up with a burgundy-colored car on Carlos Court. Pettit followed the Intrepid to Atlantic Street, where it met someone out front. A short time later, Pettit saw a male take a black bag out of the trunk. At 6:30 p.m., Pettit observed a male in a white shirt at the trunk of the Intrepid. Two minutes later, the Intrepid left with a green Dodge Neon. Both vehicles went to Sam's Food Lot on Carver, and someone from the Dodge got out and talked to the driver of the Intrepid.

At 6:41 p.m., a conversation in which Morrison contacted Martinez was intercepted. In it, Morrison said he needed money to make a car payment, and so gave "Mike" a good deal. Morrison spoke of how much he received per gram, and said he gave "Mike" a lot of rings and things that weighed about 10 to 15 grams apiece. When Martinez asked whether "Mike" paid 650 for what Morrison gave him, Morrison responded affirmatively and said he got two for Martinez, two for Silva (to whom he referred by a nickname), and two for himself, and would get 50 the next day. Martinez said that sounded good. Immediately after, Morrison telephoned Silva, informed him of the deal, and said that if Silva wanted $200, to come to Turlock and get it. Silva said he would. Morrison also informed Silva that he had instructed "Mike" to say they only sold stuff to him one time. At approximately 7:00 p.m., Pettit saw the Intrepid go to an apartment complex in the 500 block of Angelus Street in Turlock, where it remained for about 12 minutes.

Surveillance of the Woodglen residence showed Morrison and Martinez leaving in a green truck at 2:50 a.m. on September 3. Martinez was driving. At 9:46 p.m. the next night, a conversation between Morrison and Martinez was intercepted in which Morrison told Martinez that he had sold some pieces of jewelry for "three," and that, if Martinez wanted $100, he should come and get it.

At 3:34 p.m. on September 8, a conversation between Silva and Morrison was intercepted in which Silva said he was trying to get some stuff moved because he had to be out of his location by 6:00 the next morning. Silva said he was trying to find a storage facility, but that "they" called him earlier and had some people who wanted to look at the jewelry. When Morrison asked whether Silva's "old lady" or Shady told Silva that, Silva replied that it was his "old lady."  Morrison asked whether Silva wanted him to go over there. When Silva said yes, Morrison said he was already on his way and had everything with him. In another conversation at 10:19 that night, Martinez and Morrison discussed the price per gram, and that if "they" only

17

wanted a few small items, then the cost would be "half price the tags."

At 10:32 p.m. on September 9, a conversation between Silva and Morrison was intercepted in which Morrison informed Silva that he and "Anthony" wanted to "do some money making." Morrison asked if Silva wanted to go out with them. When Silva said he did not want to go out and "window shop," Morrison again asked if he wanted to go. Silva responded, "Geared up?" Morrison answered affirmatively, and Silva agreed. Morrison said they were getting on the freeway in Merced, then were going to stop by Morrison's house and then go to Anthony's. He said he would call Silva when they got to Modesto. A few minutes later, at 10:36 p.m., Silva telephoned Fouse and said he might need a driver that night. He said he had called her because "David" had called him. Fouse asked whether David had sold all of the gold; Silva responded that he did not think "they" sold it all, but "they" sold some of it the day before. Silva and Fouse then discussed when Silva would be there, and Fouse asked whether it was the same as last time, dropping him off and then coming back and getting him. He answered affirmatively and said she would not be used for anything else, as far as going with them. Fouse said she was moving slowly right then, but she could drive. She said it would be kind of fun, and that she needed something interesting in her life right then. When she asked what car she would be driving, Silva said he would find out and see if they needed a driver, and would call her back. Silva then telephoned Morrison and asked if they were going to need a driver. When Morrison said yes, Silva said he would get Shady. Discussion then turned to what car they were going to use. Morrison responded that his mother had his Intrepid, his Thunderbird was "all primered up," and they would not all fit in Anthony's truck. Silva agreed and said his "nightmare" was full of his belongings, but that he could unload it at his house. They then discussed where they would meet. It was agreed they would meet at Silva's home, and that Morrison would grab his things and get ready at Anthony's, and then he and Anthony would go to Hilmar. Silva called Fouse back at 10:47 p.m. and told her they would be needing a driver. Two minutes later, there was a conversation between Morrison and Silva in which Morrison asked whether Silva had "the Moss" at his house. When Silva said he had both of them right there, Morison said he wanted to use "the big one with the belt."

At 11:33 that night, a conversation between Silva and Fouse was intercepted in which Fouse said she saw "all them cops" and asked where Silva was. When Silva said the police were at a particular store, Fouse said now that they knew where all the police were, they should "do something" in Turlock "really fast." When she asked if Silva was at home, he replied that he was on Lander, not far from "you guys." Agent Pettit, who was conducting aerial surveillance, saw the Mitsubishi arrive at the First Street residence at 11:37 p.m. At 11:40 p.m., the Cold Pimp'n Buick arrived. At 11:48 p.m., the officer surveilling the residence on First Street, which was a short distance west of Lander Avenue, saw a female and a male standing by the Cold Pimp'n vehicle. The man was dressed in black. At 11:58 p.m., a telephone conversation was intercepted in which Silva asked Morrison where he was. Morrison replied that they were already dressed and leaving Anthony's house. Silva said he had to unpack his car.

Surveillance on Martinez's new residence on Carpenter Road in Modesto showed that the green Dodge pickup associated with Martinez was parked out front at 11:30 p.m. Martinez and Morrison were seen taking items from the residence to the vehicle at least twice, then they left in the truck just prior to midnight. Both were dressed in dark clothing, and it appeared they had placed something dark, like a duffel bag, in the cab of the truck. Agent Pettit began aerial surveillance of the vehicle at approximately 12:06 a.m., and followed it to the First Street residence in Hilmar.

At 12:04 a.m. on September 10, Vieira saw the female back the Cold Pimp'n Buick, which was parked on the street, into the driveway, underneath the carport. At 1:05 a.m., a female and a male dressed in black got into the car. The female got into the driver's side front door, and the male got into the passenger side front door. Because the vehicle was in the carport, Vieira

18

could not tell whether anyone got in through the rear passenger doors. The vehicle then left the location. This was sometime after the green pickup arrived.

From the First Street residence, the vehicle went to an AM/PM store in Turlock, where a female got out and appeared to put gas in the car. The tinting on the vehicle's windows made it difficult for the surveilling officer to see inside the back.

The car was followed from the Turlock area to an area out in the country near Snelling, where it parked with its lights off, in an orchard across the street from a residence from 1:34 a.m. to approximately 2:27 a.m. It then left and was followed to the Hughson area.

At 3:15 a.m., Agent Pettit, who was conducting aerial surveillance, observed the Buick driving down Swanson "blacked out," i.e., with its lights turned off. It pulled into an orchard in the vicinity of a residence. Because of the trees, Pettit was unable to see whether anyone got out. Officer Myers saw the vehicle at the Swanson Road location at 3:50 a.m. The car was on the east side of the roadway, facing north, and was 10 to 15 feet off of the pavement. No exterior or interior lights were on, and the area was quite dark. Myers drove southbound on Swanson. As he passed the car, he activated his high beams. It appeared there was nobody in the front seat. He was unable to see in the back.

The Buick began moving again at approximately 4:30 a.m. Myers fell in behind the car as it headed westbound. At approximately 4:38 a.m., he became aware of a panic alarm from a home in the area in which the Buick had been parked. A pursuit of the Buick ensued.

At 4:52 a.m. on September 10, a telephone conversation between Silva and his girlfriend, Virginia "Ginger" Ellsworth, was intercepted. In it, Silva revealed that he was running from the police and was hiding on Orange, in Turlock. When Ellsworth offered to come and get him, Silva told her that he was in the backyard of his "homeboy" Anthony's house at Angelus and Orange, but that the police were all around. Silva stated that he had shot at them and asked her to hurry. At 5:26 a.m., another conversation between Silva and Ellsworth was intercepted, with Ellsworth confirming that Silva was in Anthony's backyard and telling him that the house was surrounded and the area blocked off, and she could not get to him. When she told Silva not to move and to cover himself up, he replied that he did not have anything to cover himself with, but was hiding behind the Blazer in the driveway between Anthony's and the neighbor's houses. When the girlfriend asked if Silva had a gun on him, he replied no, that he had thrown it, but did not know where. The information on Silva's hiding place was passed from the monitor in the wire room to officers on the scene.

On September 10, search warrants were executed at the residences associated with the male defendants. M.J. and Jane Doe Two, Vicki and Kenneth Myers, Adriana F.G. and Z.M., and William Gibbs subsequently identified a number of items found at the Davis Court residence and in the gold Intrepid in the driveway as belonging to them.

F.G. and Z.M., Steve Christy, and M.J. identified items found at the Carpenter Road residence in Modesto as belonging to them. Cash; nine-millimeter, .38-caliber, and .357-caliber ammunition; shotgun shells; a black Mag-light flashlight; knives; a camouflage mask type of head covering, similar to what a hunter would wear; a pair of blue jeans containing a wallet with Morrison's driver's license; and a significant amount of jewelry were found in the bedroom determined to belong to Martinez. A Winchester .22-caliber rifle and a few items of jewelry were found in the other bedroom, as was a black ski cap. Also seized from that bedroom were a black pair of K-Swiss tennis shoes, a black pair of FILA tennis shoes, a pair of K-Swiss shoes that were white with red trim, and a pair of K-Swiss tennis shoes that were white with a blue stripe.

At the First Street residence, officers found Christy's Browning shotgun, as well as other items belonging to him, M.J. and Jane Doe Two, the Bakers, the Myerses, Cozine and Frye, F.G. and Z.M., the Gibbses, and Jane Doe One. A pair of K-Swiss tennis shoes, white with red markings, and a pair of white FILA shoes, with a split-heel sole, were found in a bedroom. Also found were a sawed-off Mossberg shotgun with pistol grips; scanners tuned to Stanislaus County Sheriff's Department frequencies; the main section of the Modesto Bee, dated August 16, 2003, which contained an article about residential robberies and referred in detail to the Renteria robbery; a red suitcase containing jewelry and other items; two video camcorders; two-way radios; cell phones; gun cases and holsters; a Mag-lite metal five-cell flashlight; a can of pepper spray; a headband with a battery-operated light on the front; a black magazine containing 34 rounds of nine-millimeter ammunition; a black nylon hood cap with no visible eye or mouth holes; ammunition of various calibers; a pair of black gloves; six bandannas, two of which (including one that was black with white designs) were folded in a triangular shape with two of the corners tied in the back; and a pair of black pants, a black shirt, black shoes, and black socks in a pile on the floor of the bedroom in which paperwork bearing Silva's name was found. Also found in the house were approximately 20 large-style black plastic zip ties in a clear bag.

After the arrests, Detective Campbell requested that the jail intercept defendants' jail visits. During a visit Silva had on September 25, 2003, Silva stated that a lot of items belonging to him and his mother had been taken for people to claim, as "they" thought it was all stolen. He also said that "they" had his boots and that the boots had blood on them, which happened during the attempted murder of a farmer who was shot four times. Silva further related that a "cop" was saying he saw Silva shoot at him when Silva jumped out of the car, although Silva believed that could be contested. He related that there were also sexual penetration charges, but opined that the only way those could be linked to "us" was if "they" could place "us" in the house or at the robbery. Silva conceded a lot of items were found in his house, but asserted that, as far as he was concerned, it was only receiving stolen property.

(LD 1, pp. 5-42, footnotes omitted).

## DISCUSSION

### I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v.

1   <u>Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other*

2   *grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after

3   statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore

4   governed by its provisions.

5       II.    <u>Legal Standard of Review</u>

6       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he

7   can show that the state court's adjudication of his claim:

8       (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

9       (2)  resulted in a decision that "was based on an unreasonable determination of the facts in

10            light of the evidence presented in the State court proceeding.

11    28 U.S.C. § 2254(d);  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003);  <u>Williams v. Taylor</u>, 529 U.S.

12   at 412-413.

13       A state court decision is "contrary to" clearly established federal law "if it applies a rule that

14   contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

15   that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

16   <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005), citing <u>Williams v. Taylor</u>, 529 U.S. 326, 405-406 (2000).

17   A state court decision involves an "unreasonable application" of clearly established federal law "if the

18   state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable

19   manner."  Id., quoting <u>Williams</u>, 529 U.S. at 409-410; <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25

20   (2002)(*per curiam*).

21       Consequently, a federal court may not grant habeas relief simply because the state court's

22   decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable.

23   <u>Wiggins v. Smith</u>, 539 U.S. 510, 511 (2003) (citing <u>Williams v. Taylor</u>, 529 U.S. at 409).  In

24   <u>Harrington v. Richter</u>, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an

25   "unreasonable application" of federal law is an objective test that turns on "whether it is possible that

26   fairminded jurists could disagree" that the state court decision meets the standards set forth in the

27   AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  <u>Richter</u>, 131 S.Ct. at 786.

28

As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction. Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens, J., concurring in judgment). The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 131 S.Ct. at 787-788.

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2). This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment"). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice

standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

### III.  Review of Petitioner's Claims.

The instant petition itself alleges the following as grounds for relief: (1) juror misconduct resulting in a violation of Petitioner's Fifth and Sixth Amendment rights; and (2) an unreasonable search and seizure violating Petitioner's Fourth Amendment rights and federal wiretap laws.  (Doc. 1, p. 4).  For the following reasons, the Court rejects Petitioner's two claims.

### A.  Juror Misconduct Violated Petitioner's Fifth And Sixth Amendment Rights.

Petitioner argues that his Fifth and Sixth Amendment rights were violated when the trial judge refused to discharge some or all of the jurors during deliberations after one of the jurors found a black zip tie in her mailbox and shared that fact with other jurors.[1]  (Doc. 1, p. 10 et seq.).  This contention is without merit.

### 1.   The 5th DCA Opinion.

The last reasoned state court adjudication of this issue was in the unpublished opinion of the 5th DCA, which rejected Petitioner's claim.  The appellate court began by explaining the factual and procedural background to this issue:

> Jury deliberations began on March 24, 2006. On April 3, the sixth day of actual deliberations, court convened outside of the presence of the jury and the defendants. The court ordered the transcript of the proceedings to remain sealed pending further court order, and asked counsel not to discuss the matter with anyone until the court and counsel had discussed it further. The court then advised counsel that Juror No. 10 had informed the bailiff that she had found a black zip tie in her mailbox that morning, and that, as she was waiting to be brought in, she discussed it with the other jurors. The bailiff had advised the court that the jurors did not feel they could continue to deliberate that day, but instead wanted to go home and be with their families. The court proposed questioning Juror No. 10 and the foreperson, then deciding with counsel what to do next.

> Juror No. 10 was then brought into the courtroom and related that her house was equipped with a mailbox and place to put the newspaper. Both were located outside the house's electric gate. As she was driving through her gate onto the street about 8:30 that morning, on her way to court, she saw a black zip tie hanging out of the newspaper box. It was between 12 and 15

---

[1] During trial, evidence was presented that, during the series of home invasions, the perpetrators frequently bound the hands and legs of the victims with black zip ties.  Also, when Petitioner and his co-defendant Silva were finally apprehended, quantities of black zip ties were found in the vicinity of the two men.

inches long, zipped in a loop, and similar in type to the heavy-duty ones she had been seeing in court. She knew it had not been there the day before and did not think it was something someone would do as a prank, because she did not think her son or his friends knew about the zip ties. When asked how it had affected her, Juror No. 10 explained that it shook her up, because to her, it was like a message. That was her first thought. She admitted telling the other jurors about it in the jury deliberation room, and suggested that one of the other jurors needed to tell the court about a situation that had happened earlier.

After assuring Juror No. 10 that juror information was confidential, the court observed that she looked like she was shaken up, and asked how this event had affected her ability to sit as a juror in this case. Juror No. 10 responded, "Well, I have to say today is very awkward. You know, it's just kind of mind-boggling right now, because I think, you know, the shock of it all I think too. I'm a very honest person, and I don't think that sways me in any way. I mean, I don't feel like because of that it's going to make me change my mind or make me feel any different than how we're going about it right now and being objective and being honest with what's going on and with everything." She did agree with the court's assessment that the day would not be a very productive one for deliberations, at least for her. When asked her "take" on how other jurors felt, she said they were "pretty much shook up too," and that they all felt it was "kind of hard to go into that today."

Counsel were permitted to question the juror. When Spokes noted the juror had indicated she thought it could be a message and asked whether she had formed an opinion as to whom the message may have been from, Juror No. 10 responded, "I just feel like someone who's friends with the defendants, somebody that just-I don't know." When asked if she had thought it could be a friend of the victims, the juror responded that she did not look at it that way. Spokes informed her, and the prosecutor confirmed, that the jury questionnaire did not bear the juror's address, and that the defendants did not get to look at any of the questionnaires. He asked whether the juror ever suspected she was being followed; she responded no, and that she used a post office box number, not her street address, on everything.

The trial court directed Juror No. 10 not to discuss the questions she had been asked with the other jurors, then had Juror No. 8 brought in. She related an incident about which she had not thought until Juror No. 10 said what had happened to her. When she got home from court on Thursday and pulled into her driveway, a car stopped in the middle of the road. In it were two Hispanic males, ages 25 to 29, with dark hair and fair skin. The car was dark blue. When her son asked if he could help them, one of them said they were looking for a particular street. When her son said he did not know where it was, they left. There was no street by that name in the neighborhood. Juror No. 8 did not recognize them and had not seen them sitting inside the courtroom. She would have thought nothing of what happened absent the new information, and her learning the new information from Juror No. 10 would not affect her ability to serve as a juror in this case. Juror No. 8 believed the day would be a productive day of deliberations for her personally, but could not speak for others.

Juror No. 12, the foreperson, was then brought in. When asked how the information disclosed by Juror No. 10 would affect Juror No. 12's ability to deliberate in this case, she responded that it did not affect her personally. She stated, "I find it alarming, and I find it very frightening, but it doesn't change the direction I'm headed." She subsequently clarified that her emotions "[a]bsolutely" would not cause her to be less than fair and impartial, and that part of her emotion had been feeling badly that Juror No. 10 was so upset. She agreed with the court's statement that nobody knew who did it; when Spokes interjected that they certainly knew the defendants did not do it, Juror No. 12 responded, "We know that too." The prosecutor pointed out, and the court confirmed, that the press had reported zip ties being found at numerous residences involved in the case. When asked whether it would be a productive day to deliberate, Juror No. 12 related that Juror No. 10 had been very upset by the time she reached

the deliberation room, and that she told the other jurors before they even got behind closed doors. As soon as they were let in, they immediately told the bailiff. They did not deliberate after finding out the information, as Juror No. 10 was obviously shaken and, while not crying, was tearful. They also did not sit around and try to say who was responsible or how the zip tie got there, although they obviously knew nobody in the courtroom did it. Everybody was a little shocked, but Juror No. 12 personally felt more settled than when she first heard the news, as people had been just sitting there, chitchatting. Juror No. 12 felt that the rest of the jurors would probably be okay to continue, but that it should be Juror No. 10's decision, because she was the most nervous about it. Aside from Juror No. 10 being upset, Juror No. 12 did not notice anyone having a particularly adverse reaction to the news.

The jurors were given the day off and asked to return the next day.  They were ordered not to discuss the matter with anyone else or to have further discussions among themselves.

The next day, the court allowed counsel to suggest areas of inquiry, and it then questioned each juror individually.  Juror No. 10 was first. The court stated its understanding that she had contacted the bailiff the day before about additional zip ties being found at her home. Juror No. 10 related that her husband had, and that the Turlock Police Department had responded. She did not think finding the zip ties would have any additional impact on her, because she believed they may have come from a basketball hoop her son had installed the prior September.  The juror agreed with the court's statement that there was no evidence or information as to the source of the first zip tie. When asked about her initial reaction that the defendants may have somehow been responsible, Juror No. 10 stated, "I have done a lot of thinking and stuff, and I don't know to be honest. I don't know. That's still in the back of my mind, you know, that it might be a statement. I don't know from someone." She agreed that she did not know who it might be, and that it could have been anyone. The court reminded her that the defendants were in jail, which had been known since jury selection, and that her juror information was not public. It then noted that she had been upset the day before, and asked whether that had changed in the last 24 hours. She said yes, that she felt better, and that she thought it was just the initial shock of everything-wondering what it was and whether it meant something, or whether somebody had followed her home. When the court asked whether the incident would affect her ability to serve as a juror, she replied that she did not think so, and that she believed she would be able to set it aside and make her decision in the case based solely from the evidence she had heard in the trial. When pressed, she clarified that she would not favor either side, and that it would not influence her. Although it scared her, she would not speculate as to the source in terms of letting it enter into her deliberations.

Juror No. 1 was next. She admitted speculating about the source of the zip tie, and being very scared. She stated: "I took it as a warning like, oh, you know, we know where you live." The court reminded Juror No. 1, who, it stated for the record, cried when responding about people possibly knowing her address, that all juror information was confidential, and that her address had not been disclosed and was not on the jury questionnaire. Juror No. 1 responded that she understood that; she also agreed with the court's statement that there was no evidence as to the source of the zip tie. She stated that, although she had a hard time thinking it was random or a coincidence, she also thought it could have come from a victim's family, as there were some unhappy victims, or the defendants probably had some family members in court who could have followed one of the jurors. Juror No. 1 stated that she could see both sides, and that it scared her to think that someone possibly followed a juror home. When asked whether she could make her decision in the case based solely on the evidence she had heard in the trial and ignoring the zip tie, she stated she thought she could and had all along. She stated that she thought she had kept an open kind and been able just to look at the evidence, but she admitted that she was scared and a little nervous. She believed she could look at the evidence, because she did not know who did it and never would. Being scared would not affect how she decided. When asked whether her reaction had changed in the last 24 hours, she said no, that she was

still nervous, and was more aware when she went home. When asked again whether her deliberations would be affected by the information in any way, she responded, "No, I don't think it would be affected. I don't know who did it. It could have been a victim. It could have been a friend of a defendant. It could have been a victim, friend of a victim, so I cannot sit here and say yes, it was the defendants' family or friends that did it. I don't feel that way. I just feel that it was a sick thing to do, and it just makes me nervous. I feel like I'm in a movie, *The Juror*. I don't know." When asked if she felt she could continue to deliberate, the juror stated, "As long as nothing else happens like this, because I feel like if I find a zip tie, I will not go on. [¶] ... [¶] "[T]his in itself I don't feel like I have a problem going on, but I do feel like it is in my mind, and I don't think I'm going to-I've gone this far keeping an open mind, looking at the evidence. This does not-it's not going to make me go, okay, I'm going to sway one way or the other. I haven't been doing that the whole time. This is not going to make me do it, but am I nervous for my family that something stupid might happen? Yes. By who? I don't know. So I'm-I don't know. That's just how I feel. I don't know if I'm contradicting myself, but I don't know."

Next, the court questioned Juror No. 2. This juror felt badly for Juror No. 10, because she was visibly upset, but "it did nothing for [Juror No. 2] one way or the other." Juror No. 2, who would have had no problem deliberating the day before, did not speculate concerning who might be responsible for the zip tie, "because it could be any number of things." Learning the information would not cause Juror No. 2 to favor or be against either side, and the juror would be able to make a decision solely based on the evidence.

Upon hearing what happened, Juror No. 3 was worried for Juror No. 10, but not for him- or herself. When asked about speculating as to who might have been responsible, the juror replied, "I think we all did to a certain extent. I know that I thought about it, but what good is that going to do? You can sit there and speculate all day long, and it's still your speculation. There's no hard evidence to point to any one particular person so why do that?" Juror No. 3 did not speculate as to one side, because it could have been someone who knew Juror No. 10 was on jury duty, a friend of her son who was trying to do something silly, an associate of a defendant or Juror No. 10's children, or anybody-not necessarily somebody intending harm. Juror No. 3 would "[a]bsolutely" be able to refrain from speculating as to who might have been responsible. As far as any change in reaction, initially Juror No. 10 was frightened, so Juror No. 3 was concerned for her. Now that Juror No. 10 was calm and fine, Juror No. 3 was fine. Juror No. 3's concern was for Juror No. 10's emotional well-being, not for what could potentially happen. What happened was "unrelated to the trial in [Juror No. 3's] mind." It would not affect deliberations.

Juror No. 4 felt bad for Juror No. 10. At most, the information might have impacted Juror No. 4 a little bit, but the juror was aware there was no evidence about the source, and Juror No. 4 did not want to blame the defendants or victims or anyone for doing this. Juror No. 4 would be able to make a decision solely based on the evidence, and would not speculate as to how the zip tie got into the mailbox.

Juror No. 5 related that, when he arrived the day before, Juror No. 10 was upset. He asked what was wrong, and she said she had found a black zip tie in her newspaper box. He was concerned about her because she was very upset. Although he found it odd, it did not cause him personal concern. He did not speculate on who might be responsible, and had no thoughts about that. As far as affecting his deliberations, he planned to continue as he had "been going so far." It would not affect his deliberations in any way, and he would not favor either side as a result of learning the information.

Juror No. 6 related being told the information by Juror No. 10 while waiting in the hallway for the door to be opened. Juror No. 10 was tearing up and looked scared. Everyone was surprised.

Juror No. 6 was stunned and scared for Juror No. 10. Juror No. 6′6 reaction had not changed in 24 hours-it was still a feeling of concern, but not fear. As to who was responsible, Juror No. 6 probably speculated a little bit and thought it was someone one of the defendants knew. Juror No. 6 had no knowledge of who did it, but thought it had something to do with the case-not that the defendants had a part in it, but that it was somebody who was concerned about them. Neither her speculation nor the information received from Juror No. 10 would enter Juror No. 6's deliberations or be held against either side.

Juror No. 7 related being in the hallway when Juror No. 10 entered, looking upset. When the other jurors asked what was wrong, she told them. They tried to console her and discussed whether it could be coincidental. They thought it probably was not. Juror No. 7 personally was shocked and upset, as she wondered who put the zip tie there and how they knew where Juror No. 10 lived. She was no longer as upset as she had been; she thought more possibly it was a coincidence and might not be related to the case. She initially thought that if someone did put it there on purpose, it might be a friend of the defendants. Juror No. 7 would be able not to speculate about the source in deliberating and to base her decision solely on the evidence.

Juror No. 8 heard the information in the hallway, felt badly for Juror No. 10 because she was scared, and gave her a hug. Juror No. 8 personally did not feel afraid or speculate as to who might have done it, as anyone could have been responsible. Juror No. 8 would disregard the information and make a decision based solely on the evidence.

Juror No. 9's reaction, upon hearing the information, was mostly one of disbelief. Although who might have done this crossed his mind and he thought perhaps it might be a friend of someone, he had no idea. He felt nervous, but less so after 24 hours. He understood no one knew who put the zip tie there, and he could stop speculating and not let it enter his deliberations. As far as he was concerned, this would not be any different than any other information the court told jurors to disregard, and he thought jurors thus far had been doing a very good job of sticking to the facts they had been given.

Juror No. 11 related that she learned about the zip tie inside the jury room, when Juror No. 10 stated it to all of them. Some may have found out before that. Although it did not change the way she viewed the evidence and how she felt about everything, she was definitely frightened. She did not have any children, but her husband came home late and left early, and she was a little afraid to be by herself. Nevertheless, she would be fair; she definitely did not feel the defendants did this. She did not think it was possible for them to do it, although the situation "definitely jumped [her] nerves." She did not speculate who might have done it; she had no idea, and it seemed a little coincidental. When asked whether she would be able not to speculate, Juror No. 11, who began tearing up as she was answering, said she was not really sure. She explained that her parents lived a few blocks from Juror No. 10, and she sometimes left court and went straight there. She assumed, since no one knew juror information, they could possibly have been followed. She did not know by whom, but it made her nervous. Her reaction had not changed in the last 24 hours; she was still "just kind of afraid." She stated, "I don't feel my decisions are any different. It could have nothing to do with this. I'm just a little bit afraid." When asked whether she would be able to disregard the information in terms of her deliberations, she responded, "Yes, it really doesn't affect-it's just my own personal safety that it affected, but it doesn't affect it at all. I've separated the two. I know that sounds really confusing." Juror No. 11 reiterated that the information she received from Juror No. 10 would not have any impact on her decisionmaking process in this case and would not affect her deliberations in any way. When asked specifically about whether the fear she was feeling would affect her deliberations, Juror No. 11 said no, that it would just affect her when she was going home and coming back. She did not feel in fear being in court.

Juror No. 12 was the next person questioned. She related that when she heard the information

from Juror No. 10, her reaction was one of surprise, as she had never heard of black zip ties before this trial. It bothered her that Juror No. 10 was upset and tearful. The reaction Juror No. 12 felt upon hearing this and seeing Juror No. 10 was upset lessened over time, as she was rational enough to think that she did not need to be that concerned about it. She was not afraid at all for her personal safety, and did not speculate as to who might have been responsible. It was obviously not one of the defendants, and it never would have occurred to her to think it was. She did not know Juror No. 10 personally and did not know anything about her home. Juror No. 12 left court the day before feeling totally normal and had a normal evening and night. Her reaction this day was the same; she thought they would probably just continue deliberating. When asked whether she would be able to ignore the information in her deliberations, Juror No. 12 replied, "Absolutely. I don't have a fright over that, and I haven't picked up any vibes this morning around me that anyone else does, but that's just my speculation." The information would not affect her deliberations in any way.

After concluding the questioning of the other jurors, the court had Juror No. 10 brought back into the courtroom for follow-up questions about the incident's effect on her. Juror No. 10 said that the fact the zip tie was found in her mailbox would not affect her deliberations in any way, and she would be able to set it aside just like anything else the court had instructed jurors to set aside. She did not have any doubt about that.

Defendants subsequently challenged the entire panel based on the likelihood the issue would affect jurors' decision-making processes in the case, and alternatively, the responses and emotional states of Juror Nos. 1, 10, and 11, and the fact there were not enough alternate jurors to replace those three. The court denied the challenge to the entire panel, but invited counsel to address the jurors individually. After argument with respect to Juror No. 1, the trial court stated: "It's obvious that Juror Number 1 was upset. She was tearing and used Kleenex during the questioning, but I will note that she was probably the most tearful of all the jurors throughout the trial.... I have noticed her tearing during various testimony throughout this trial, so I'm not going to place a lot of credence in that. She's obviously upset, but she did state that the information that she had she seemed to have equal potential blame for either the victims and/or the defendants, indicated it could be either side, and that she would not be swayed, and based on her statements to the Court, I will deny the challenge to Juror Number 1. I find her statements to be credible."

There were no challenges to Juror Nos. 2 through 9. After argument with respect to Juror No. 10, the trial court ruled: "It's obvious to me that Juror 10 was visibly upset yesterday. I think she has been among the most stoic of the jurors throughout the trial, pretty much expressionless throughout the trial. I did notice what appeared to me her being upset yesterday.... She did request that we not deliberate yesterday because she was still upset .[¶] She certainly looked more like her normal self today when she came back, indicated herself that she was feeling better today, and she is of the opinion that the zip ties could have been anyone. Within the realm of possibilities could include, I suppose, the defendants, could include the victims, a message that maybe this is taking too long, could have just been chance. [¶] And she did stated that ... this would not influence her decision, and she indicated that she would be true to herself and would not speculate as to the source of this, and I find that her statements-she appeared to be credible to me and did express her true feelings. And even yesterday said, I have to be completely honest, and I believe that she was, so the challenge the Juror Number 10 is denied ."

Counsel then argued with respect to Juror No. 11. The court stated: "As I recall she stated that she does not feel that the defendants were responsible for this. [¶] ... [¶] And not in fear being here. And, frankly, I think listening to this trial we probably are a little bit more cautious about things that could happen to us. And, frankly, I did not notice whether she cried during the trial or not.... [¶] ... [¶] She did today, but during the trial. I don't know if that's an unusual situation

29

for her or not.... [¶] But early into the questioning today she pretty much volunteered on her own that this would not change her deliberation, and based on that I will deny the challenge of Juror Number 11.”

There was no formal challenge to Juror No. 12. Nevertheless, the court stated: “She indicated as of today she was not afraid, and, frankly, I think that we all had a very similar reaction when we found out the news about what had happened, and we're all human, including the jurors, and I don't think that there's a substantial likelihood that they would be influenced by this. And what I will do before the jury starts deliberating once again, I'm going to give them an admonition....”

After the lunch recess, the jurors were returned to the courtroom. The court admonished them not to speculate as to the cause of the zip tie being found in Juror No. 10's mailbox, to disregard it completely, not to allow it to enter into their deliberations in any way, and to pretend it never happened. They then resumed deliberations, and continued to deliberate for all of April 5, 6, 7, and 10. On April 11, they returned their verdicts.

(LD 1, pp. 124-136).

The 5th DCA then analyzed the claim as follows:

 “If at any time, whether before or after the final submission of the case to the jury, a juror ... upon ... good cause shown to the court is found to be unable to perform his or her duty, ... the court may order the juror to be discharged....” (§ 1089.)  “A trial court's ruling whether to discharge a juror for good cause under section 1089 is reviewed for abuse of discretion. [Citations.]” (People v. Guerra, 37 Cal.4th at p. 1158.) A trial court's discretion to investigate and remove a juror in the midst of trial is broad (People v. Boyette (2002) 29 Cal.4th 381, 462, fn. 19); however, “[t]he juror's inability to perform the functions of a juror must appear in the record as a ‘demonstrable reality’ and will not be presumed. [Citation.]” (People v. Guerra, supra, 37 Cal.4th at p. 1158.) “This is a ‘heightened standard’ [citation] and requires a ‘stronger evidentiary showing than mere substantial evidence’ [citation].” (People v. Wilson, supra, 44 Cal.4th at p. 840.) The decision whether to retain or discharge a juror “rests within the sound discretion of the trial court” and, “[i]f any substantial evidence exists to support the trial court's exercise of its discretion, the court's action will be upheld on appeal. [Citation.]” (People v. Maury (2003) 30 Cal.4th 342, 434; see also People v. Earp (1999) 20 Cal.4th 826, 892 [decision to retain or discharge juror upheld unless it falls outside the bounds of reason].) These standards apply even where the asserted ground for discharge is jury misconduct. (See People v. Miranda (1987) 44 Cal.3d 57, 117 [applying abuse of discretion standard to denial of motion for new trial based on jury misconduct], disapproved on other grounds in People v. Marshall (1990) 50 Cal.3d 907, 933, fn. 4.)

“An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ‘ “capable and willing to decide the case solely on the evidence before it” ‘ [citations].” (In re Hamilton, supra, 20 Cal.4th at pp. 293-294; Smith v. Phillips, supra, 455 U.S. at p. 217; see also Ristaino v. Ross (1976) 424 U.S. 589, 595, fn. 6 [extending rights to criminal defendants in state courts].) “A defendant is ‘entitled to be tried by 12, not 11, impartial and unprejudiced jurors. “Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced.” [Citations.]’ [Citations.]” (Harris, supra, 43 Cal.4th at p. 1303.)

“[W]here a verdict is attacked for juror taint, the focus is on whether there is any overt event or circumstance, ‘open to [corroboration by] sight, hearing, and the other sense’ [citation], which

30

suggests a *likelihood* that one or more members of the jury were influenced by improper bias.[ ] [¶] When the overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors, the event is called juror misconduct. [Citations.] A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation. [Citations.]" (*In re Hamilton, supra,* 20 Cal.4th at pp. 294-295, fn. omitted.) Misconduct can be good cause for discharge of a juror under section 1089 (*People v. Ledesma* (2006) 39 Cal.4th 641, 743) even if it is "neutral" in the sense that it does not suggest bias toward either side (*People v. Daniels* (1991) 52 Cal.3d 815, 863-864), but removal is not necessarily the remedy required in every case (see *People v. Guzman* (1977) 66 Cal.App.3d 549, 559).

In determining whether discharge is required in a particular case, it must be remembered that "[m]isconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice. [Citations.]" (*In re Hamilton, supra,* 20 Cal.4th at p. 295; *Remmer v. United States* (1954) 347 U.S. 227, 229; *People v. Guzman, supra,* 66 Cal.App.3d at p. 559.)  It must also be remembered, however, that " ' "[i] is an impossible standard to require ... [the jury] to be a laboratory, completely sterilized and freed from any external factors." [Citation.] Moreover, under that "standard" few verdicts would be proof against challenge.' [Citation.] 'The safeguards of juror impartiality ... are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.]" (*People v. Danks* (2004) 32 Cal.4th 269, 302-303.)

In the present case, for the sake of argument, we will assume misconduct occurred, even though, for the most part, jurors did nothing improper. Since the origin of the zip tie in Juror No. 10's newspaper box is unknown, we have no way of determining whether it was indeed a communication related to this case. "'[W]hen the alleged misconduct involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant. [Citations.]' [Citations.]" (*In re Hamilton, supra,* 20 Cal.4th at pp. 305-306; *People v. Federico* (1981) 127 Cal.App.3d 20, 38.) Here, several jurors perceived, at least initially, that a message was being sent about the case. Thus, regardless of whether there was an actual communication, jurors received extraneous information, which several of them believed related to the case, that was not part of the evidence received at trial. Accordingly, we will assume that jurors' involuntary exposure to the event, which was outside the trial evidence, requires an examination for probable prejudice, regardless of the extent to which no blameworthy conduct occurred. (*People v. Ramos* (2004) 34 Cal.4th 494, 519; *In re Hamilton, supra,* 20 Cal.4th at pp. 294-295; but see *People v. Farnam* (2002) 28 Cal.4th 107, 139, 141, fn. 13 [rejecting suggestion juror misconduct might be established where, while in presence of three jurors, fourth juror was robbed].)  In addition, despite the fact jurors were instructed to "promptly report to the court any incident ... involving an attempt by any person either to improperly influence any member of this jury or tell a juror his or her view of the evidence in this case," Juror No. 10-however understandably-first related the incident to the other jurors. Although a report apparently was made immediately to the bailiff, there also appears to have been at least a modicum of discussion-again understandably-among the jurors. Jurors had also been instructed: "You must not converse among yourselves ... on any subject connected with the trial. You must discuss this case only when all the following conditions exist: [¶] A, the case has been submitted to you for your decision by the court following arguments by counsel and jury instructions; [¶] B, you are discussing the case with a fellow juror; [¶] And, C, 12 jurors and no other persons are present in the jury deliberating room." While the discussion occurred after the case had been submitted to the jury for decision and did not involve nonjurors, it did not concern evidence admitted at trial and,

though not directly about the guilt or innocence of the defendants, cannot be said to have had no bearing on the matter pending before the jury. (See People v. Avila (2006) 38 Cal.4th 491, 605.) Thus, again, arguably, misconduct occurred. (See In re Hitchings (1993) 6 Cal.4th 97, 118 [violation of duty, codified in § 1122, that jurors must not converse among selves on subject connected to trial, or form or express opinion thereon until cause finally submitted to them, constitutes misconduct; but see People v. Panah, supra, 35 Cal.4th at p. 480 [jurors' understandable concerns about being followed by supporters of defendant did not amount to misconduct].)

"Juror misconduct ... leads to a presumption that the defendant was prejudiced thereby and *may* establish juror bias. [Citations.]" (People v. Nesler, supra, 16 Cal.4th at p. 578 (lead opn. of George, C.J.), italics added.)  "We assess prejudice by a review of the entire record. 'The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test.' [Citation.] In general, when the evidence of guilt is overwhelming, the risk that exposure to extraneous information will prejudicially influence a juror is minimized. [Citation.] An admonition by the trial court may also dispel the presumption of prejudice arising from any misconduct. [Citation.]" (People v. Tafoya (2007) 42 Cal.4th 147, 192-193; accord, People v. Danks, supra, 32 Cal.4th at p. 303; People v. Nesler, supra, 16 Cal.4th at pp. 578-579 (lead opn. of George, C.J.); In re Carpenter (1995) 9 Cal.4th 634, 653-654.)

"'Whether prejudice arose from juror misconduct ... is a mixed question of law and fact subject to an appellate court's independent determination.' [Citation.] However, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citation .]" (People v. Danks, supra, 32 Cal.4th at pp. 303-304.) With respect to credibility determinations, the trial court's assessment of jurors' states of mind will not necessarily be dispositive, such as when there is inherent prejudice (see Holbrook v. Flynn (1986) 475 U.S. 560, 570 [courtroom security arrangement] ) or where bias is "clearly apparent" from the record (People v. San Nicolas (2004) 34 Cal.4th 614, 646.  While a juror's declaration of impartiality may not be conclusive (Irvin v. Dowd, supra, 366 U.S. at p. 728; People v. Williams (1989) 48 Cal.3d 1112, 1129), neither is it irrelevant: " '[O]ne may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.' [Citations.]" (Smith v. Phillips, supra, 455 U.S. at p. 217, fn. 7.)

Finally, the California Supreme Court has emphasized "'that before a unanimous verdict is set aside, the likelihood of bias under either test must be *substantial* .... [T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. [Citation.] Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic.' [Citation.]" (People v. Danks, supra, 32 Cal.4th at p. 304, quoting In re Carpenter, supra, 9 Cal.4th at pp. 654-655.)

We turn first to the issue of inherent bias. "'[A] finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment.' [Citation.]" (People v. Danks, supra, 32 Cal.4th at p. 305.) Stated in a way that is more

applicable to what occurred here, was the information or event so inherently prejudicial that by its very nature it was likely to have influenced the vote of jurors? (See People v. Nesler, supra, 16 Cal.4th at p. 580 (lead opn. of George, C.J.).)

We conclude the answer is no. We do not find it surprising that a number of jurors initially jumped to the conclusion someone on the side of the defense was somehow responsible: so did Martinez's trial attorney, who mused, "I can't imagine our clients being so stupid," before being reminded (1) he was on the record, and (2) there was nothing to tie the incident to defendants and no suggestion from the prosecutor that they were to blame. Jurors were aware from the outset that defendants were incarcerated and could not have done it themselves, and, by the day after it happened, even those jurors who were still upset were aware the source could have been anyone or it even could have been a coincidence. That some jurors may have been upset or harbored nebulous fears about the safety of themselves or their families does not mean what occurred was, by its very nature, likely to have influenced their deliberations. The test of inherent bias is not whether jurors may have been affected in some way, but whether their *decisionmaking process*-and, ultimately, their *votes*-likely were influenced.

"[W]e do not reverse unanimous verdicts because there is *some* possibility the juror was improperly influenced. Rather, the likelihood of bias under the inherent prejudice test 'must be *substantial*.' [Citation.] 'Application of this "inherent prejudice" test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information.' [Citation.]" (People v. Danks, supra, 32 Cal.4th at p. 305.)

Objectively considering what took place in light of the record in this case, we conclude the finding of the zip tie by Juror No. 10, and her dissemination of that information to other jurors and their discussion of it, were not inherently and substantially likely to bias any juror. (See People v. Danks, supra, 32 Cal.4th at p. 305.) Jurors were forcefully and directly admonished not to speculate as to the source of the zip tie and to disregard it completely, and we see no reason to find inapplicable " '[t]he crucial assumption underlying our constitutional system of trial by jury,' " to wit, that jurors follow instructions. (People v. Yeoman (2003) 31 Cal.4th 93, 139; cf. People v. Holloway (1990) 50 Cal.3d 1098, 1111-1112 [conclusion that presumption of prejudice unrebutted might have been different had misconduct been revealed in time for trial court to take corrective steps such as admonition], disapproved on other grounds in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1.) This is especially true where, as here, no actual threat was made (see Harris, supra, 43 Cal.4th at pp. 1300-1306 [death threat against juror's father, originally believed to be related to case, not too inherently prejudicial to be disregarded] ); the communication-assuming it was a communication-was ambiguous (cf. Jeffries v. Wood (9th Cir.1997) 114 F.3d 1484, 1488, 1490-1492 [where one juror informed others of defendant's prior criminal record, communication by its nature was intrinsically prejudicial; factors suggesting potential prejudice was diminished in particular case so that verdict was not affected include (1) whether prejudicial statement was ambiguously phrased; (2) whether extraneous information was otherwise admissible or merely cumulative of trial evidence; (3) whether curative instruction was given or other ameliorative steps taken; (4) the trial context; and (5) whether statement was insufficiently prejudicial given issues and evidence in case] ), and jurors did not return guilty verdicts soon after learning of events, but instead continued to deliberate for several more days (see People v. Manriquez (1976) 59 Cal.App.3d 426, 429-431 [juror in robbery trial became victim of attempted armed robbery just prior to deliberations, then told other jurors; trial court did not learn of incident until deliberations were underway, at which time it questioned jurors about ability to decide case strictly on evidence presented].) Moreover, their verdicts demonstrate that they carefully and methodically worked through the issues before them.

Having found no inherent prejudice, "we now consider 'the nature of the misconduct and the surrounding circumstances' to determine whether it is substantially likely [any juror] was

33

nevertheless actually biased as a result" of what occurred. (People v. Danks, supra, 32 Cal.4th at p. 306.) "What constitutes 'actual bias' of a juror varies according to the circumstances of the case. [Citation.] In assessing whether a juror is 'impartial' for federal constitutional purposes, the United States Supreme Court has stated: 'Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.' [Citation.] ' "The theory of the law is that a juror who has formed an opinion cannot be impartial." [Citation.] [¶] It is not required, however, that the jurors be totally ignorant of the facts and issues involved.... It is sufficient if the juror can lay aside his impression or opinion *and render a verdict based on the evidence presented in court.*' [Citations.] ' "[L]ight impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but ... those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him." ' [Citations.] An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial. [Citations.]" (People v. Nesler, supra, 16 Cal.4th at pp. 580-581 (lead opn. of George, C.J.).)

Here, the receipt of the information was totally inadvertent, both on the part of Juror No. 10 and the jurors she then told. To the extent Juror No. 10 or other jurors disobeyed any admonitions, we find it significant that they simply had a very human reaction to a startling event and upset fellow juror. There was no deliberate misconduct or willful failure to follow instructions. (Compare People v. Holloway (2004) 33 Cal.4th 96, 125 [failure to discharge juror not abuse of discretion, and no substantial likelihood juror biased, where discussion of case with alternate juror was not deliberate disobedience to admonitions] with People v. Ledesma, supra, 39 Cal.4th at p. 743 [juror admitted discussing case with wife in violation of admonition, an act of deliberate misconduct; juror's serious and willful misconduct is good cause to believe juror will not be able to perform duty]; People v. Daniels, supra, 52 Cal.3d at pp. 863-864 [same; juror repeatedly violated court's instructions].) It was not discussed during deliberations; in fact, Juror No. 12 was very clear that jurors neither deliberated after finding out the information nor discussed how the zip tie came to be in Juror No. 10's newspaper box or who was responsible. Moreover, it was not information directly concerning defendants per se, and each juror ultimately realized the ambiguity of what occurred. (Compare People v. Danks, supra, 32 Cal.4th at p. 308 [juror's misconduct in sharing Bible passages with fellow jurors demonstrated neither substantial likelihood of her actual bias nor likelihood it resulted in actual bias of other jurors, where juror did not repeatedly refer to extrajudicial information or attempt to impose her views on others] with People v. Nesler, supra, 16 Cal.4th at pp. 583-585, 587, 588-589 (lead opn. of George, C.J.) [juror intentionally interjected extraneous information, directly concerning defendant and substantially related to important matters raised during trial, into deliberations, suggesting substantial likelihood of actual bias on her part].) Although some jurors were still upset, fearful, or at least nervous 24 hours later, a juror's safety concerns or even fear of a defendant do not necessarily suggest bias. (See People v. Jablonski (2006) 37 Cal.4th 774, 807; People v. Navarette (2003) 30 Cal.4th 458, 499-500.) What matters is whether the individual can separate feelings and emotions from his or her duties as a juror, and evaluate the evidence fairly and decide the case solely on the evidence presented at trial. (See People v. Farnam, supra, 28 Cal.4th at pp. 139-142.)

In the present case, the trial court's inquiry was more than adequate (compare People v. Farnam, supra, 28 Cal.4th at pp. 141-142 with People v. McNeal (1979) 90 Cal.App.3d 830, 835), and it was in the best position to observe jurors' demeanors when it questioned them about their ability to perform their duties. Their answers furnished substantial evidence to support its credibility determinations. (Harris, supra, 43 Cal.4th at p. 1305.)

We conclude that, under the totality of the circumstances surrounding what took place, there is no substantial likelihood any juror was actually biased against defendants. (See <u>Harris, supra</u>, 43 Cal.4th at p. 1306.) In light of that conclusion and our conclusion of no inherent bias, any presumption of prejudice stands rebutted, and the trial court did not abuse its discretion in refusing to discharge any or all of the jurors. (See <u>People v. Holloway, supra</u>, 33 Cal.4th at p. 126; <u>In re Hamilton, supra</u>, 20 Cal.4th at p. 296; <u>People v. Zapien</u> (1993) 4 Cal.4th 929, 997.)

(LD 1, pp. 139-149).

### 2.   The State Court Adjudication Was Not Objectively Unreasonable.

The Sixth Amendment right to trial by jury "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961).  If the jury is exposed to extrinsic facts not introduced as evidence, a defendant is deprived of his right to confrontation, cross-examination, and assistance of counsel under the Sixth Amendment. <u>Dickson v. Sullivan</u>, 849 F.2d 403, 406 (9th Cir.1988).   While the Supreme Court has never rejected the idea of implied juror bias, implied bias by a juror has rarely been applied.  See  <u>United States v. Plache</u>; 913 F.2d 1375, 1377 (9th Cir. 1990); <u>Tinsley v. Borg</u>, 895 F.2d 520, 527 (9th Cir. 1990).  "Only in extreme or extraordinary cases should bias be presumed."  <u>Plache</u>; 913 F.2d at 1377, *quoting*, <u>Tinsley</u>, 895 F.2d at 527.

"[A] petitioner is entitled to habeas relief only if it can be established that the constitutional error had 'substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Lawson v. Borg</u>, 60 F.3d 608, 612 (9th Cir.1995), <u>quoting</u>, <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 & n. 9,113 S.Ct. 1710, 1722 & n. 9 (1993).   The Ninth Circuit has found that whether a constitutional error is harmless is not a factual determination entitled to the presumption of correctness under 28 U.S.C. § 2254(d).  <u>Lawson</u>, 60 F.3d at 612; <u>Dickson</u>, 849 F.2d at 405; <u>Marino v. Vasquez</u>, 812 F.2d 499, 504 (9th Cir.1987).  Thus, this Court does not simply defer to the California court's finding that there was no prejudice.

However, there is no requirement that a defendant be given a new trial each time a juror has been placed in a situation that could potentially be compromising.  <u>Smith v. Phillips</u>, 455 U.S. 209, 217, 102 S.Ct. 940, 946 (1982).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and

to determine the effect of such occurrences when they happen." Id.

In determining whether the jury's consideration of extrinsic evidence was so substantial and injurious as to violate the Constitution, the Court must consider:  "(1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of ... whether the introduction of extrinsic material [substantially and injuriously] affected the verdict." Lawson, 60 F.3d at 612; see also  Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir.1993); Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir.1986).  "None of these factors should be considered dispositive." Jeffries, 5 F.3d at 1190.  The Court is also to place great weight on the nature of the extrinsic evidence introduced.  See Jeffries, 5 F.3d at 1190-91; Dickson, 849 F.2d at 406-07; Marino, 812 F.2d at 506.

As well, the Court looks to whether the extrinsic evidence was "rendered insignificant by overwhelming evidence of guilt." Lawson, 60 F.3d at 613.  Other factors to be considered include "whether the [extrinsic evidence] was ambiguously phrased; whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; whether a curative instruction was given or some other step taken to ameliorate the prejudice; [and] the trial context." Jeffries v. Wood, 114 F.3d 1484, 1491 (9th Cir.1997) (en banc).

Even in a habeas context, "reversible error commonly occurs where there is a "direct and rational connection between the extrinsic material and a prejudicial jury conclusion, and where the misconduct relates directly to a material aspect of the case." Lawson, 60 F.3d at 612-13 (quoting Marino v. Vasquez, 812 F.2d 499, 506 (9th Cir.1987)). "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." O'Neal v. McAninch, 513 U.S. 432, 438, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (quoting Kotteakos).

Here, the 5th DCA, by employing the standard set forth by the United States Supreme Court in Irvin v. Dowd and Smith v. Phillips, applied the correct standard, i.e., the proper "clearly established

1    federal law," to the issue of juror prejudice or bias.  Hence, the only issue remaining is whether that

2    adjudication is either contrary to or an unreasonable application of the standard set forth in those

3    Supreme Court cases.  After careful consideration, the Court concludes that it was not.

4          Although the state court engaged in an exhaustive analysis of this issue, which will not be

5    repeated here, several points bear emphasis.  First, the trial judge's exercise of his or her responsibility

6    to be "ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences

7    when they happen," Smith, 455 U.S. at 217 n. 7, inherently involves the trial court's "appraisal of

8    witness credibility and demeanor."  Thompson v. Keohane, 516 U.S. 99, 111, 116 S.Ct. 457 (1995).

9    In performing that function, the trial judge is best positioned to make decisions regarding credibility

10   and demeanor; hence, the "judgment of the jurist-observer" has been given "presumptive weight" in

11   these matter.  Id.  The trial judge in this case interviewed all twelve jurors extensively before

12   concluding that Petitioner's motion to dismiss the jury should be denied for lack of prejudice or bias.

13   Petitioner has pointed to nothing in the record that would support a conclusion that the trial judge did

14   not execute his responsibilities regarding credibility and demeanor in a reasonable manner.  Thus, the

15   Court agrees with the 5th DCA that "the trial court's inquiry was more than adequate…and [the trial

16   judge] was in the best position to observe jurors' demeanors when it questioned them about their

17   ability to perform their duties."  (LD 1, p. 149).

18         Second, applying the standards set forth in Lawson, the triggering event was when Juror No.

19   10 discovered a black zip tie in her mailbox during deliberations.  She was obviously shaken by this

20   discovery, immediately shared it with the other jurors, and, soon after, with the judge.  Notably, the

21   black zip tie found by Juror No. 10 was not, in and of itself, "evidence" of any culpability by

22   Petitioner; rather, it was construed by Juror No. 10 as an anonymous veiled threat, presumably from

23   someone affiliated with the defense.  However, during the juror interviews, and after emotions had

24   subsided somewhat, a more thoughtful and comprehensive perspective emerged as a consensus among

25   the jurors that nobody could really know who placed the zip tie in the juror's mailbox, no one could

26   prove that Petitioner was involved in the occurrence in any way or, indeed, that it was even done with

27   his knowledge, that the event had no bearing on the evidence and testimony introduced at trial or the

28

                                                    37

question of Petitioner's guilt or innocence, and that none of the jurors felt the event would affect their deliberations.  Given the relatively short period of time that was consumed from the discovery of the zip tie to denial of Petitioner's motion to discharge the jury, given the lack of evidentiary value of the zip tie to the many factual and legal issues involved in the case, given the substantial evidence of Petitioner's guilt, and given the trial judge's thorough canvassing of the jury and his ultimate conclusion that no bias or prejudice had resulted, the judge's denial of Petitioner's motion was both reasonable and justified.  Petitioner has not identified any circumstance or fact that would even suggest, much less establish, a "direct and rational connection between the extrinsic material and a prejudicial jury conclusion." Lawson, 60 F.3d at 612-13.  Accordingly, the state court's adjudication of this issue was neither contrary to nor an unreasonable application of clearly established federal law.

### B. **Wiretap Evidence Was An Unreasonable Search And Seizure**.

Petitioner also alleges that the trial court erred in refusing to suppress evidence resulting from a wiretap of Petitioner's telephone calls.  (Doc. 1, p. 4, 28-38).  Again, this contention is without merit.

#### 1. The 5th DCA Opinion.

The last reasoned state court decision was the 5th DCA's unpublished decision, which denied Petitioner's wiretap argument as follows:

**Background**

In August 2003, the People sought and obtained judicial authorization for the interception of communications to and from cellular telephones with the numbers (209) 505-9835, which was subscribed to Patricia Ramos, and (209) 614-7098, which was subscribed to Silva. Silva subsequently filed a motion to suppress all evidence obtained by means of wiretaps, in which the other defendants joined. The trial court determined that the interceptions were lawful and denied the motion. Consequently, the contents of intercepted cellular telephone conversations were admitted into evidence at trial, as described in the statement of facts, *ante.*

Defendants now say the trial court erred in denying the motion. They contend that SDEA Agent Hoek's affidavit in support of the application for the interceptions failed to demonstrate the requisite necessity. We disagree.

**Analysis**

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520) comprises the comprehensive federal scheme for the regulation of wiretapping and electronic surveillance .[Footnote] (People v. Otto (1992) 2 Cal.4th 1088, 1097.) It "establishes minimum standards for the admissibility of evidence procured through electronic surveillance; state law cannot be less protective of privacy than the federal Act." (Id. at p. 1098.) Thus, "[i]n 1995, the Legislature enacted section 629.50 et seq. in order 'to expand California wiretap law to conform to the federal law.' [Citation.]" (People v. Leon (2007) 40 Cal.4th 376, 383 .) Under

section 629.50, a district attorney or other specified individual can apply to the presiding judge of the superior court (or a designee) for an order to intercept wire, electronic pager, or electronic cellular telephone communications. Footnote] (Id., subd. (a).) Among other requirements, the application must contain "[a] full and complete statement of the facts and circumstances relied upon by the applicant to justify his or her belief that an order should be issued, including ... (B) the fact that conventional investigative techniques had been tried and were unsuccessful, or why they reasonably appear to be unlikely to succeed or to be too dangerous...." (Id., subd. (a)(4).)

Under section 629.52, the designated judge may authorize the interception if there is probable cause to believe that an individual is committing, has committed, or is about to commit one or more of the crimes listed in the statute, including murder, a felony violation of section 186.22, or an attempt or conspiracy to commit such crimes (§ 629.52, subd. (a)(2), (3), (5)); there is probable cause to believe communications concerning the illegal activities will be obtained through the interception (id., subd. (b)); there is probable cause to believe the targeted communication device is being used, or will be used, by the person whose communications are to be intercepted (id., subd. (c)); and "[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous" (id., subd. (d)).

Defendants do not challenge the issuing court's finding of probable cause as to any of the interceptions. Rather, their sole assertion is that the application was not supported by an adequate showing of necessity within the meaning of section 629.52, subdivision (d), so that evidence seized as fruit of the interceptions should have been suppressed under section 629.72.

Because section 629.52, subdivision (d) and its federal counterpart, 18 United States Code section 2518(c)(3) employ identical language, federal courts' interpretation of the latter section necessarily informs our analysis. The California Supreme Court has summarized the applicable case law thus:

"The requirement of necessity is designed to ensure that wiretapping is neither 'routinely employed as the initial step in criminal investigation' [citation] nor 'resorted to in situations where traditional investigative techniques would suffice to expose the crime.' [Citation.] The necessity requirement can be satisfied 'by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case.' [Citation.] As numerous courts have explained, though, it is not necessary that law enforcement officials exhaust every conceivable alternative before seeking a wiretap. [Citations.] Instead, the adequacy of the showing of necessity ' "is 'to be tested in a practical and commonsense fashion,' ... that does not 'hamper unduly the investigative powers of law enforcement agents.' " ' [Citation.] A determination of necessity involves ' "a consideration of all the facts and circumstances." ' [Citations.]" (People v. Leon, supra, 40 Cal.4th at p. 385.)

A motion to suppress evidence obtained pursuant to section 629.50 et seq. is made, determined, and reviewed in accord with section 1583.5. (§ 629.72.) The standard of appellate review of a trial court's ruling under section 1538.5 "is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (People v. Glaser (1995) 11 Cal.4th 354, 362.) Within this framework, although generally "the government must overcome the statutory presumption against granting a wiretap application by showing necessity" (United States v. Ippolito (9th Cir.1985) 774 F.2d 1482, 1486, citations omitted), "[a] defendant bears the burden of proving that a wiretap is invalid once it has been authorized. [Citation.]" (United States v. Ramirez-Encarnacion (10th Cir.2002) 291 F.3d 1219, 1222; cf. Franks v. Delaware (1978) 438 U.S. 154, 171; People v. Amador (2000) 24 Cal.4th 387, 393.) "The finding of

necessity by the judge approving the wiretap application is entitled to substantial deference. [Citations.]" (People v. Leon, supra, 40 Cal.4th at p. 385.)

Agent Hoek's affidavit in support of the application for intercept authorization was 52 pages long. In pertinent part, Hoek recited his experience in investigations involving wire intercepts and electronic surveillance. He certified that named law enforcement agencies/task forces were conducting a criminal investigation of Morrison, Silva, Martinez, "and others yet unidentified" in connection with possible violations of specified provisions of the Penal Code, and that there was probable cause to believe the three named individuals and "others known and others not yet known" had committed, were committing, and would continue to commit violations of the criminal statutes set forth in section 186.22 of the Penal Code, viz., participating in criminal street gangs. After describing the kind of information he asserted there was probable cause to believe would be obtained through the requested interception, Hoek asserted: "Normal investigative techniques have been tried, and have been successful, in identifying and securing some evidence against the Target Subjects. However, normal investigative techniques have been tried and have been unsuccessful in identifying any other co-conspirators involved in the Subject Offenses and in securing any evidence against anyone else. Normal investigative techniques have not identified any other individual conspiring in this case. Normal investigative techniques have failed to produce sufficient evidence to arrest and prosecute the Target Subjects. Normal investigative techniques targeting these goals have been tried and have failed, or reasonably appear unlikely to succeed if tried, as is described further in the 'Conclusion' section."

Hoek then proceeded to describe and detail the criminal histories of Morrison, Martinez, Silva, and several other persons. [Footnotes] By incorporating the statement of Detective Green, who was assigned to the Stanislaus County Sheriff's Special Investigation Unit and whose responsibilities included investigation of crimes committed by criminal street gangs and their membership, Hoek then set out information establishing a pattern of criminal gang activity for the Norteno criminal street gang, Silva's and Morrison's association with the gang, and the fact Silva was reputed to be a lieutenant in the Northern Structure portion of the overall Norteno gang organization.

Hoek then summarized the current investigation, which began in May 2003. He included the fact that he had been advised, by Detective Campbell, that Campbell's agency had received information from four separate, independent sources, naming Morrison, Martinez, and Silva, and possibly two others, as being responsible for at least some of the robberies. One source handed a deputy a card that bore the names of Morrison, Martinez, and two others, and said they were the perpetrators. The second source was a citizen who informed the assistant sheriff that the perpetrators were related to an ex-felon who went by the name Yo-Yo, and that Yo-Yo's son was involved. The third source was a citizen who told a detective that Morrison used to be a stereo thief but was now driving nice cars with expensive rims, and the person believed he was involved. The fourth source was a citizen who was known to one of the detectives. This person informed the detective that she had been in contact with two people who had information about the robberies. She put one of these people, "X," in phone contact with the detective. "X" agreed to provide information on condition that she remain anonymous. She would not identify herself to the detective and expressed fear of retaliation. "X" stated that she had personal knowledge of the robberies; named Morrison, Silva, and Martinez as the perpetrators; and furnished details that had not been made public. Hoek recited the information given by "X" and the extent to which some of it had been corroborated.

Next, Hoek described the surveillance that had been conducted on Morrison's, Silva's, and Martinez's residences since August 13, 2003. In part, Hoek related that surveilling agents could not park on Davis Court, thus limiting what they were able to see there. Hoek further related that he had attended a debriefing on August 18, at which time Detective Campbell informed

him that Campbell had received information concerning the August 15 robbery from a fifth source ("Y"), who requested to remain anonymous.  Campbell had been able to determine the identity of the source, but did not furnish the name to Hoek. "Y" told Campbell that another person had told him that, when Silva and Morrison arrived at the First Street residence on the morning of August 15, they were wearing black clothing that was covered with blood. This person told "Y" how Silva and Morrison cleaned the clothing and then disposed of it in a dumpster in an apartment complex in the vicinity of Liberty Market in Delhi. "Y" described to Campbell how to get to Morrison's residence, and said Morrison had buried some guns under a piece of tin siding in an empty lot behind his house. SDEA agents went to the lot the day after receiving the information, but did not see a piece of tin siding anywhere at the location. An aerial check likewise did not reveal any tin siding and, because of the close proximity of Morrison's residence and other homes, investigators did not attempt to use any type of metal detection device to scan the property. Subsequent investigation revealed that there were no apartments in the vicinity of Liberty Market in Delhi, and that in fact, the only apartment complex in Delhi was across from Davis Court. Agents checked those dumpsters, but they had already been emptied.

Hoek related that the parole agent for one of the residents at the Davis Court address conducted a home visit at that location on the evening of August 18. The parole agent saw a black duffel bag, which was closed and appeared to be full, behind the front door. The next day, a parole search was conducted at the residence. The duffel bag was not located. However, ammunition-some of which was the same caliber as spent shell casings found at the scene of the August 15 robbery and shooting-was found. Hoek further related that he had obtained subscriber information for one telephone by means of a search warrant served on the telephone company, and that he had obtained a court order for a pen register and trap-and-trace for Silva's phone. Information from the pen register, coupled with surveillance, revealed that Morrison was connected to Silva's phone on the evening of August 26.

Hoek provided a summary of the robberies, and related Detective Campbell's belief, based on the method of operation and the information being received from various sources, that the same group of suspects was responsible. Campbell further related to Hoek that, on August 21, he was contacted by an individual ("Z"), whom he believed to be a citizen informant, and who stated he would give information on condition that he remain anonymous. According to Campbell, "Z" identified himself by first name only and said he was related to the family of one of the responsible parties. Campbell met with "Z" in person. "Z" named Morrison and Martinez as the two main responsible parties. "Z" said others were also involved, and he identified them and their relationship to Morrison. "Z" related that Morrison's mother was getting all the jewelry from the robberies and was selling drugs out of her home, and when she ran out of drugs, she would trade some of the jewelry for more. "Z" further related that Martinez's cousin worked for the Gibbs family, and that the cousin had once taken Martinez to the Gibbs residence.

Hoek related that 10 distinctive shoe prints had been found at the various crime scenes, but that there had been no more than three shoe prints found at any one scene. One victim, however, thought there were five individuals involved in his robbery, based on the different voices and locations from which the voices had come.

Hoek requested that one page of the affidavit be sealed. He based his request on the fact that the information was sufficiently specific as to reveal the source; to Hoek's knowledge, only the source knew the information; the source would not give a name for fear of reprisal; and if the information were released, the source's safety would be endangered.

Hoek next summarized the target telephone information, including toll analysis and analysis of call data records and cell site information, which was obtained and analyzed in an attempt to

41

determine which cell sites were used by the target phones two hours before and after each robbery. Hoek explained that, due to the possibility a call would be sent to a secondary tower during peak hours, the call data records and cell site tower information obtained from the pen register were not an exact reflection of the location of the phone when it was in use.

In an eight-page section titled "EXHAUSTION/NEED FOR INTERCEPTION," Hoek stated:

"As set forth, law enforcement has obtained a great deal of information pertaining to this investigation. At present, applicant believes there is circumstantial evidence against the Target Subjects. However, applicant believes that this case could be strengthened by a continued investigation.

"Interception of wire communications to and from (209) 505-9835 and (209) 614-7098 are necessary in order to achieve all of the objectives of this investigation (as described previously), because normal investigative techniques have failed or appear reasonably unlikely to succeed if tried, or are too dangerous. In the preceding paragraphs, applicant detailed the probable cause showing (209) 505-9835 being used by David Morrison and (209) 614-7098 being used by David Silva. Probable cause was also documented by showing the results of traditional investigative techniques. These techniques have failed to provide the necessary evidence for proof beyond a reasonable doubt against Target Subjects.

"Traditional investigative techniques have taken place. Likewise, they will continue to be employed if approval for this intercept is obtained. However, so far those traditional means of investigation noted below have failed to uncover the direct evidence in this investigation, the activities and identities of any and all other co-conspirators, and for reasons set forth below, Applicant believes that the investigative goals set forth, likely will not be achieved in the future through alternative investigative techniques alone."

Hoek then proceeded to separately discuss each traditional means of investigation, as follows:

*Physical surveillance:* Hoek related that the method had been successful in physically linking addresses, vehicles, and cellular phones used by the target suspects, and establishing that the suspects associated with each other. However, agents were unable to watch all three known residences at the same time due to manpower restrictions; moreover, Delhi and Hilmar were small communities, and so it was hard for agents to be in either area for any great length of time without being noticed. Hoek stated his belief that further surveillance, conducted without the support of the requested interception, would compromise the investigation by increasing the opportunities for detection by the target subjects. Such detection could cause the subjects to abandon their communication facilities, making it extremely difficult to obtain incriminating information from them, and could also cause them to flee the area, making an arrest difficult or nearly impossible. Hoek asserted that an intercept would permit agents to initiate selective surveillance when it appeared criminal activity was taking place, thus reducing the chance of surveillance being compromised. He noted that normal duty hours for surveillance had been from 6:00 p.m. to 6:00 a.m., seven days a week, with the amount of man-hours dedicated to the investigation causing a substantial burden on the agencies involved and other pending investigations.

*Interviews, grand jury subpoenas, and immunity:* Hoek asserted that subpoenaing the target subjects or anyone else who might be involved would not be completely successful in achieving the goals of the investigation, because any coconspirator likely would invoke his or her Fifth Amendment privilege not to testify before a grand jury. Granting immunity to one of the target subjects was unadvisable, because to do so might foreclose prosecution in this case; moreover, there would be no way to ensure such immunized witness(es) would provide truthful testimony, should additional conspirators be identified. Furthermore, the service of grand jury

subpoenas on the target subjects or anyone else would only alert them to the existence of this portion of the investigation, causing them to alert other, unknown perpetrators, become more cautious in their activities, flee, threaten the lives of cooperating witnesses, or otherwise compromise the investigation.

*Confidential informants:* Hoek related that, according to Detective Campbell, the sources who talked to law enforcement expressed fear of retaliation by the target subjects, and there were no reliable confidential informants other than anonymous citizens. Merced County Sheriff's Detective Garcia advised that he had no reliable informants providing information on the target subjects, and he was only receiving information from persons who obtained it second- and third-hand. Although a search for testifying witnesses continued, Hoek knew of no other possible witnesses who could and would be willing to disclose information about the target subjects and the gang activity. He believed any potential witnesses would have to have preexisting ties, or be engaged in some type of conspiracy, with the target subjects for several weeks and that, in his experience, such individuals would be rare because they would not want to cooperate against a family member or loved one, or would live near the target subjects and be in fear for their safety should their cooperation become known. Hoek related that he did not know of any confidential informant who could assist in the investigation, and he believed that if such an informant did not know the target subjects or their immediate families, the target subjects would not talk in detail about what was occurring because they would not know whether the informant could be trusted. Furthermore, an informant approaching one of them might alarm them by leading them to believe they were now being considered the main suspects in this investigation.

*Undercover agents:* Hoek related that the only informants who had provided information had not identified themselves, and so he believed they would not introduce an undercover agent to the target subjects. He further asserted that, without knowing who the informants were, an introduction would be too dangerous, and that, because of the violent nature of the crimes, the use of an undercover agent would be too dangerous.

*Interviews of suspect:* Based on his training and experience, Hoek believed that interviewing the target subjects would not be successful in developing sufficient evidence, as, if arrested, the suspects would not admit their criminal involvement. Hoek noted that the target subjects had been incarcerated in state facilities before, and expressed his opinion they were not likely to cooperate with law enforcement.

*Search warrants:* Hoek reiterated that he had obtained and served search warrants and orders for phone subscriber information, call data records, and pen registers. He acknowledged that he and detectives believed there might be probable cause to search the residences of the target subjects. He further believed, however, that any residential search would be futile and that, without intercepted communications to guide the timing of when to conduct searches of vehicles or other locations, such searches likely would produce little evidence. Hoek noted that a parole search of Morrison's residence had been conducted, but that sufficient evidence to show guilt or innocence was not found. As Silva was reputed to be an officer in the Northern Structure and almost all of the target subjects had been through the judicial system, Hoek related that investigators believed the target subjects had been schooled not to keep evidence of their criminal activities in their residences or vehicles. Accordingly, Hoek did not believe the execution of search warrants would achieve all the goals of the investigation.

*Toll records:* Hoek related that pen registers, toll information, and trap-and-trace devices would provide identifying information regarding calls made from or to a particular telephone, along with the frequency of those calls, but would not establish the identities of those actually conversing or the content of the conversations. Thus, while valuable tools, they would not, by themselves, achieve the goals of the investigation.

43

*Trash searches:* Hoek noted that the trash search at the apartment complex was unsuccessful, and related that agents were fearful of being discovered if they attempted residential trash searches. He related that Davis Court was a small court, and that there was too much street activity on South Orange. He noted that on one occasion, when agents were doing a walk-by in an attempt to obtain license numbers of vehicles parked in the yard, they could see someone standing in the shadows of 733 South Orange, and that this occurred when the agents thought the residents were asleep. Based on his training and experience, Hoek asserted that suspects such as those in this case go to great lengths to destroy possibly incriminating evidence and will not frequently use their residential trash containers to dispose of it. Instead, they will commonly shred their documents, carry their trash away from their residences, and place it in commercial dumpsters to avoid having it examined. Because Hoek knew of no other locations at which trash searches could be conducted, he did not believe any further such searches would achieve the goals of the investigation, although the interception of conversations concerning certain locations might make it appropriate to conduct trash searches at that time.

*Tracking devices and cameras:* Hoek related that on August 20, pursuant to court order, a radio frequency tracking device was installed on the Buick the target subjects were believed to be using to commit the crimes. The device did not record the vehicle's movement, however, and was only used in locating the vehicle should it become lost during surveillance. Hoek related that installation of a device, such as a GPS tracker, that was capable of recording and downloading data would not be practical, as the vehicle would have to be taken to a secure location in order to properly install the equipment. Hoek further related that, on the evening of August 20, agents were able to install a camera in a warehouse in Hilmar. The camera allowed a view of the front of Silva's residence. Within a week, the camera's location and target(s) were the subject of rumors in Hilmar, however, and so the camera was removed and the warehouse's owner told that a suspect had been apprehended in Sacramento. Agents had been unable to find a location on Davis Court or South Orange at which discretely to install a camera.

We conclude that, when tested in a practical and commonsense fashion, the foregoing adequately establishes the requisite necessity. (See People v. Leon, supra,  40 Cal.4th at p. 385.) The fact the investigation had been successful in many respects does not mean necessity, based on the failure of traditional investigative techniques, was not or could not be shown. "[T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap. [Citations.]" (United States v. Bennett (9th Cir.2000) 219 F.3d 1117, 1122.) "[A] wiretap can be necessary if it gives the government the ability to 'develop an effective case.' [Citation.]" (United States v. McGuire (9th Cir.2002) 307 F.3d 1192, 1198.) " 'An effective case' " means "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." (*Ibid.*) "[A]s the federal cases have recognized, '[w]hat amount of evidence will be sufficient to obtain a conviction is an imprecise concept.' [Citation.]" (People v. Zepeda (2001) 87 Cal.App.4th 1183, 1204.) In the present case, while the use of normal investigative techniques may have produced probable cause to search and/or arrest, the case against the male defendants was far from overwhelming-and, at the time interception was sought, the case against Fouse was nonexistent. (See id. at p. 1205 [adequate showing made where eyewitness descriptions were general and insufficient to identify perpetrator of apparently gang-related drive-by shooting, information connecting defendant to crime came from telephone callers who wished to remain anonymous, and evidence gathered produced only circumstantial case].)

Nor is the necessity requirement an exhaustion requirement. (United States v. Castillo-Garcia (10th Cir.1997) 117 F.3d 1179, 1187, overruled on other grounds in United States v. Ramirez-Encarnacion, supra, 291 F.3d at p. 1222, fn. 1.) While electronic eavesdropping procedures are not to be routinely employed as the initial step in criminal investigations (United States v. Giordano (1974) 416 U.S. 505, 515), "the government does not need to exhaust all other investigative procedures before resorting to wiretapping. [Citations.] Nor must ordinary

44

techniques be shown to have been wholly unsuccessful. [Citations.] Rather, the [authorizing] court must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence-to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable. [Citations.]" (United States v. Abou-Saada (1st Cir.1986) 785 F.2d 1, 11.) "[T]he necessity requirement does not compel law enforcement agents to use wiretaps only as a last resort" (United States v. Carneiro (9th Cir.1988) 861 F.2d 1171, 1181; United States v. Brown (9th Cir.1985) 761 F.2d 1272, 1275); "[t]he statute does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope" (United States v. Baker (9th Cir.1979) 589 F.2d 1008, 1013). "The overall burden on the government 'is not great.' [Citations.]" (United States v. Verdin-Garcia (10th Cir.2008) 516 F.3d 884, 890.) It "'"need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient."'" [Citation.]" (People v. Leon, supra, 40 Cal.4th at p. 392.)

We recognize that boilerplate recitations of the limitations inherent in certain methods of investigation, and generalities or statements that are true of most or all investigations of the kind at issue here, are insufficient to establish necessity. (United States v. Blackmon, supra, 273 F.3d at pp. 1210-1211; United States v. Ippolito, supra, 774 F.2d at p. 1486.) Similarly, conclusory statements about the likely outcome of future investigations carry little weight. (United States v. Kerrigan (9th Cir.1975) 514 F.2d 35, 38.) "An affidavit composed solely of conclusions unsupported by particular facts gives no basis for a determination of compliance with [the necessity requirement]." (United States v. Spagnuolo (9th Cir.1977) 549 F.2d 705, 710.)

However, "the affidavit here did not simply reiterate conclusory language. It instead analyzed with particularity the limitations of each alternative investigative technique in achieving the goals of this investigation. That many of those limitations are common to most [similar] conspiracy investigations does not necessarily preclude a finding of necessity. [Citation.]" People v. Leon, supra, 40 Cal.4th at pp. 389-390.) Similarly, the fact that some of Hoek's statements and conclusions were based on his training and experience did not render them unworthy of consideration. (See id. at pp. 388-389.)

Moreover, although "a mere allegation 'that a person is a member of a conspiracy ... is not a sufficient reason to obtain a wiretap' [citation]," "the fact of a conspiracy is a circumstance to be considered, along with all the other facts and circumstances, in determining whether conventional investigative techniques have failed, are unlikely to succeed if tried, or are too dangerous to try." (People v. Leon, supra, 40 Cal.4th at p. 391.) "[I]n many cases, the existence of a conspiracy will suggest not only that there *will be* communications in order to plan the crime, but that such planning will occur almost *exclusively* during such communications. Furthermore, the existence of the conspiracy may not only increase the likelihood any given crime will succeed, but also the likelihood the criminal enterprise will survive the arrest of less than all of its participants.... In sum, the existence of a conspiracy, while not determinative, is an important factor in analyzing the necessity for a wiretap. [Citation.]" (Id. at pp. 391-392.)

Here, the affidavit showed that law enforcement officers from multiple jurisdictions were investigating a series of increasingly violent, possibly gang-related home invasions that were being committed by at least three, and possibly more, individuals. Although the investigation was approximately three months old and officers had employed a variety of conventional techniques, the case against defendants was less than overwhelming, and the number of conspirators still uncertain.

45

The affidavit explained that, while surveillance was continuing, its efficacy was limited both by manpower considerations and by the possibility it would be detected due to the fact it was taking place in small communities and, in the case of Davis Court, on a small street. "These facts were sufficient to permit the issuing court to conclude" (United States v. Smith, supra, 31 F.3d at p. 1300) that further surveillance-at least without intercepted communications to inform its timing and location-was unlikely to succeed in producing an adequate case against the target subjects and their coconspirators. (See United States v. Young (2d Cir.1987) 822 F.2d 1234, 1237 [surveillance of subject's residence impractical where such surveillance in residential neighborhood likely to be conspicuous and draw attention to assigned officers]; United States v. Ai Le (E.D.Cal.2003) 255 F.Supp.2d 1132, 1139 [covert surveillance of residence difficult because of location in sparsely populated new development].) We do not know whether additional manpower might have been obtained from other law enforcement agencies, but its availability is of no consequence. "To show that 'other investigative procedures have been tried and failed' the affidavit must reveal that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed to achieve their ends. The good faith effort need not have exhausted all possible uses of ordinary techniques. What is required is a showing that in the particular investigation normal investigative techniques *employing a normal amount of resources* have failed to make the case within a reasonable period of time." (United States v. Spagnuolo, supra, 549 F.2d at p. 710, fn. omitted, italics added.) Moreover, additional manpower would not have solved the problems caused by the nature and character of the locations being watched.

The affidavit related the information obtained from individuals, but explained that almost all were anonymous and/or fearful of retaliation; moreover, the source of information was not always clear and sometimes was second- or third-hand. It also explained the problems that likely would be encountered in using known, reliable confidential informants. These facts were sufficient to permit the issuing court to conclude that this investigative technique was not likely to be productive. (See People v. Zepeda, supra, 87 Cal.App.4th at pp. 1206-1207 [finding of necessity supported where police obtained significant information from confidential or anonymous informants who were afraid to come forward; in light of demonstrated reluctance and fact offense appeared to be gang-related, police likely to encounter difficulty finding people willing to testify at trial]; United States v. Smith, supra, 31 F.3d at pp. 1299-1300 [facts supported conclusion that continued use of confidential informants not likely to be productive where police exhausted knowledge of all known informants and knew of no one else who was willing to provide information or testify]; United States v. Ai Le, supra, 255 F.Supp.2d at p. 1139 [government clearly detailed limitations on traditional investigative techniques where affidavit explained, for example, that some of its confidential sources were unwilling to testify, were unavailable for further interviews, and did not know full extent of target organization's operations].)

The affidavit also discussed the potential use of search warrants. Although "Z" related that Morrison's mother was getting most of the jewelry from the robberies, he did not say where that jewelry was being kept. Even assuming it was at her house, it could reasonably be concluded execution of a search warrant would turn up nothing more than stolen property, which would provide only circumstantial evidence linking the target subjects to perpetration of the robberies themselves, while alerting those subjects to the investigation. Moreover, a parole search of Morrison's residence was unproductive. These facts were sufficient to permit the issuing court to conclude the execution of search warrants, without intercepted conversations to inform their timing, was unlikely to produce significant evidence.

The affidavit also explained investigators' reasons for rejecting the option of interviewing and/or subpoenaing the target subjects or other potential suspects. The facts were sufficient to permit the issuing court to conclude such techniques were likely to fail. (See People v. Zepeda,

supra, 87 Cal.App.4th at p. 1206 [government's obligation to show necessity satisfied where alternative investigative procedures, such as directly questioning defendant and associates, would likely alert subjects to presence and scope of investigation]; United States v. Smith, supra, 31 F.3d at p. 1300 [affidavit explained that police did not believe any of participants in conspiracy would testify about it before grand jury, even under subpoena, without grant of immunity, which would alert other conspirators to investigation].) By the time the approval for interceptions was requested, the target subjects had no reason to talk to law enforcement or to testify before a grand jury without a grant of immunity; given the nature of their alleged crimes, it was reasonable to assume such a grant would not be forthcoming. Although others close to them might have been willing to talk in return for a deal, there were no guarantees such a course of investigation would have been successful, especially since family members were involved, and failure of this technique would have been extremely detrimental to the investigation because it would have alerted the suspects without gaining anything in return. We do not believe the government is required to attempt a conventional investigative technique where the likelihood of success is only speculative and the cost of failure would be great.

The affidavit also furnished facts sufficient to permit the issuing court to conclude that other conventional investigative techniques had failed or were unlikely to succeed or too dangerous to try. A commonsense reading of the affidavit makes it clear there were no known, reliable informants who could get an undercover officer into the group of conspirators. Concerns expressed about the potential danger in allowing an unfamiliar informant to attempt to place an undercover officer in the group-even assuming the identity of one of the anonymous informants could be ascertained-were reasonable. (See United States v. Smith, supra, 31 F.3d at p. 1300; United States v. Young, supra, 822 F.2d at p. 1237.) Limitations on the information provided by pen registers and telephone records, while inherent in those methods, nevertheless were such that the issuing court reasonably could conclude further use would be unproductive. (See ibid.) Additional trash searches were impractical without additional information. Further camera surveillance was likely to be thwarted by the lack of good camera angles and the likelihood the target suspects had been alerted, by apparently widespread knowledge of the initial camera surveillance, to the government's use of that technique, and so would be on the lookout for further attempts. In addition, the facts contained in the affidavit were sufficient to permit the issuing court to conclude further use of tracking devices likely would not succeed.

We recognize that, in the motion to suppress, the defense suggested the government could have employed a tracking device affixed to the target vehicle by a strong magnet, or could have had a surveillance camera installed on a light pole, telephone box, etc., by officers disguised as municipal workers. Such a camera would have been visible and, according to the defense exhibit, the tracking device would have been powered by batteries that necessarily had a limited life, thus rendering the efficacy of either or both questionable. Moreover, " 'courts are reluctant to impose their hindsight upon law enforcement agencies, and the proponent of the application need not establish that "every other imaginable mode of investigation would be unsuccessful." ' [Citation.] In particular, '[a]fter-the-fact suggestions by defense attorneys as to how an investigation might have been handled are entitled to little weight in the analysis.... The fact that the government could have taken some different or additional steps in its investigation does not demonstrate that the wiretap orders were issued in error,' because ' "[t]he government need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretapping." ' [Citation.]" (People v. Leon, supra, 40 Cal.4th at p. 395; accord, United States v. Carneiro, supra, 861 F.2d at p. 1178.) " 'Courts will not invalidate a wiretap order because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not. It is enough that the affidavit explains the ... failure of several investigative techniques that reasonably suggest themselves.' [Citation.]" (United States v. Webster (5th Cir.1984) 734 F.2d 1048, 1055.)

The interceptions in the present case did not violate section 629 .52, subdivision (d). It

necessarily follows that they did not violate the Fourth Amendment of the United States Constitution. (People v. Leon, supra, 40 Cal.4th at p. 396.) Accordingly, the suppression motion was properly denied.

(LD 1, pp. 42-62).

> 2.   Habeas Review Of The State Court's Fourth Amendment Adjudication Is Foreclosed.

A federal district court cannot grant habeas corpus relief on the ground that evidence was obtained by an unconstitutional search and seizure if the state court has provided the petitioner with a "full and fair opportunity to litigate" the Fourth Amendment issue.  Stone v. Powell, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052 (1976); Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir. 2005); Woolery v. Arvan, 8 F.3d 1325, 1326 (9th Cir. 1993), cert denied, 511 U.S. 1057 (1994).  The only inquiry this Court can make is whether petitioner had a fair opportunity to litigate his claim, not whether petitioner did litigate nor even whether the court correctly decided the claim.  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); see also, Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) (holding that because Cal. Penal Code § 1538.5 provides opportunity to challenge evidence, dismissal under Stone was necessary even when the petitioner never moved to suppress).

The policy behind the Stone court's analysis is that the exclusionary rule is applied to stop future unconstitutional conduct of law enforcement.  Stone, 428 U.S. at 492.  However, excluding evidence that is not untrustworthy creates a windfall to the defendant at a substantial societal cost.  See Stone, 428 U.S. at 489-90; Woolery, 8 F.3d at 1327-28.  Thus, the Ninth Circuit has described the rationale for this rule by saying:

> The holding is grounded in the Court's conclusion that in cases where a petitioner's Fourth Amendment claim has been adequately litigated in state court, enforcing the exclusionary rule through writs of habeas corpus would not further the deterrent and educative purposes of the rule to an extent sufficient to counter the negative effect such a policy would have on the interests of judicial efficiency, comity and federalism.

Woolery, 8 F.3d at 1326; see also  Stone, 428 U.S. at 493-494.

Petitioner's Fourth Amendment claim was litigated through a fully-briefed suppression hearing in the trial court on September 20, 2005, on direct appeal to the California Court of Appeals for the Fifth Appellate District, and in a Petition for Review before the California Supreme Court.  (Clerk's

Transcript on Appeal ("CT") 6, pp. 1538-1609; LD 1; LD 5, p. 2).  Petitioner does not allege that any

of these proceedings were inadequate or deficient, only that matters were ultimately decided against

him.  Accordingly, <u>Stone</u> precludes habeas review of this claim.

3.   <u>Petitioner's Title III Claim Is Noncognizable</u>.

To the extent that Petitioner's suppression motion was based upon a purported violation of 18

U.S.C. § § 2510-2520, i.e., the Omnibus Crime Control and Safe Streets Act of 1968 ("the Act"), that

claim should be rejected.[2]

Respondent argues that the rationale of <u>Stone v. Powell</u> should be applied to Petitioner's claim

under the Act, thereby foreclosing the claim in these habeas proceedings because Petitioner had a full

and fair opportunity to litigate the claim before trial.  (Doc. 22, p. 59).  Respondent notes a split among

the federal circuits regarding whether to foreclose statutory claims outright under Stone or to apply a

"hybrid standard of review."  (<u>Id</u>.).  Respondent does not cite any authority from the Ninth Circuit on

this issue; however, it appears, with the hindsight of several additional years of jurisprudence after

Respondent filed the Answer, that the scant authority from the Ninth Circuit has more or less adopted

the hybrid standard rather than employed a <u>Stone</u> bar.  Accordingly, the Court will employ the Ninth

Circuit's analysis, but reach the same result.

In order for a state petitioner to assert a statutory claim in federal habeas corpus proceedings,

he must demonstrate that the error is "'a fundamental defect which inherently results in a complete

miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure.'"

<u>Reed v. Farley</u>, 512 U.S. 339, 348, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1991)(alteration in

original)(quoting <u>Hill v. United States</u>, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)).  As

the Ninth Circuit has observed:

---

[2] The original motion to suppress filed before trial alleges a violation of Petitioner's Fourth Amendment privilege against
an unreasonable search and seizure but also cites the Act as an additional basis for suppressing the wiretap evidence.  (<u>E.g.</u>,
CT Vol. 6, p. 1543).  On appeal to the 5th DCA, Petitioner raised only a violation of the Act, as codified in California Penal
Code § 529,50 et seq.  On appeal to the California Supreme Court, Petitioner's argument was again limited to the failure of
the affidavit for the wiretaps to meet the Act's requirements.  However, the petition itself references only the Fourth
Amendment violation, although Petitioner's state court arguments alleging violations of the Act are included as exhibits.
Because it appears that Petitioner is seeking to pursue all legal avenues regarding this issue, the Court has chosen to
address both the Fourth Amendment and the statutory contentions, even though it only appears that the latter has been fully
exhausted in the California Supreme Court.

49

Not every asserted error of law will prompt habeas relief. [Citation omitted.] Where the error is neither jurisdictional nor constitutional, the appropriate inquiry is whether the error is "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary demands of fair procedure," and whether the error "present[s] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent."

Lord v. Lambert, 347 F.3d 1091, 1094 (9th Cir.2003) (quoting Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)); Ewell v. Scribner, 2012 WL 3110462 at *2 (9th Cir. July 20, 2012)(unpublished).

A claim is not cognizable on habeas review if "the claim does not involve an 'error of the character or magnitude' to justify habeas relief." Lord, 347 F.3d at 1094 (quoting Hill, 368 U.S. at 428); Ewell, 2012 WL 3110462 at *2; see also Key v. Walker, 2009 WL 3878080 at *31 (N .D. Cal.2009) (holding "there is no clearly established Supreme Court precedent holding that a violation of [Title III] may result in a due process claim cognizable in federal habeas corpus"); cf. Phillips v. Marshall, 2009 WL 1035211 at *4 (E.D. Cal. April 17, 2009)(challenge to legality of wiretap under federal statute barred by Stone v. Powell where petitioner had full and fair hearing on issue).

In Lord, the petitioner sought habeas relief in the Ninth Circuit, claiming the government had intercepted communications from his cordless phone. The district court had found that (1) the claim was "not cognizable upon federal habeas review because any error by the state court did not result in a complete miscarriage of justice," Lord, 347 F.3d at 1093 (internal quotation marks omitted); and (2) "even if Lord had stated a cognizable habeas claim, he has not demonstrated that the decision by the [state] courts (that there was no Title III violation) was contrary to, or involved an unreasonable application of clearly established federal law," Id. at 1093–94. In affirming, the Ninth Circuit agreed that Lord had received a full and fair opportunity to present his claim to the state courts and as such, any error was not "inconsistent with the rudimentary demands of fair procedure." Id. at 1095 (quoting Hussong v. Warden, 623 F.2d 1185 (7th Cir.1980)). Because petitioner had received a full and fair opportunity to litigate the Title III issue, the Ninth Circuit found Lord's claim to be noncognizable on federal habeas review.

Here, as in Lord, Petitioner had a full and fair opportunity to litigate this claim in state court,

and therefore he fails to demonstrate that the violations, if any, of Title III's requirements resulted in a miscarriage of justice, or were omissions inconsistent with the rudimentary demands of fair procedure. See Lord, 347 F.3d at 1094.  Further, Petitioner fails to demonstrate that the wiretap evidence used at trial was otherwise unreliable.  See id. at 1095.  Accordingly, Petitioner's Title III claim is not cognizable on habeas corpus review.

Based on the foregoing, Petitioner has failed to show that the state court adjudication was an unreasonable application of clearly established federal law.  Accordingly, the Court rejects both grounds for relief and will deny the petition with prejudice.

Moreover, the Court declines to issue a certificate of appealability.  A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court;  or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denied a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right.  28 U.S.C. §

2253(c)(2).  To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further'." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Thus, the Court DECLINES to issue a certificate of appealability.

**ORDER**

For the foregoing reasons, the Court **HEREBY ORDERS** as follows:

1. The petition for writ of habeas corpus (Doc. 1), is **DENIED** with prejudice;

2. The Clerk of the Court is **DIRECTED** to enter judgment and close the file; and,

3. The Court **DECLINES** to issue a certificate of appealability.


IT IS SO ORDERED.

Dated:   __January 17, 2013__                     _____/s/ Jennifer L. Thurston__
                                         UNITED STATES MAGISTRATE JUDGE